John FACENDA, Jr., executor of the estate of John Facenda and John Facenda, Jr., in his own right

v.

N.F.L. FILMS, INC., et al.

Civil Action No. 06–3128.

United States District Court, E.D. Pennsylvania.

May 3, 2007.

Paul A. Lauricella, Philadelphia, PA, Tracy P. Hunt, Timby Hunt LLC, Newtown, PA, for John Facenda, Jr.

Bruce P. Keller, Debevoise & Plimpton, New York City, Robert N. Spinelli, Kelley Jasons McGuire & Spinelli, LLP, Philadelphia, PA, for N.F.L. Films, Inc., et al.

## ORDER AND OPINION

HART, United States Magistrate Judge.

In this action, John Facenda, Jr., in his own right and as executor of the estate of his father, John Facenda, (herein, "Facenda"), has sued NFL Films, Inc., The National Football League, and N.F.L. Properties, LLC, (collectively "NFL"), in connection with the use of recordings of the voice of the late Mr. Facenda in a film about the sports computer-simulation game, Madden NFL 06.[1] Facenda has asserted a claim for invasion of privacy under Pennsylvania tort law, unauthorized use of name or likeness under 42 Pa.C.S.A. § 8316, and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

The parties have filed cross-motions for summary judgment as to liability. For the reasons that follow, the court will enter judgment in favor of Facenda on his claim under 42 Pa.C.S.A. § 8316, and the Lanham Act, but in favor of the NFL on the tort claim.

### I. Factual and Procedural Background

#### A. John Facenda

John Facenda, who passed away in 1984, was a Philadelphia television news anchorman, and the narrator of NFL Films' game footage and highlight reels. Plaintiff has provided evidence showing Facenda's popularity in both roles, and the strength

1. NFL maintains that the caption of Facenda's complaint makes minor errors in setting forth the names of the Defendants, but does not argue that the incorrect parties were sued.

of the identification between his voice and NFL Films.

Barry Wolper, chief financial officer for NFL films conceded at his deposition that he had heard Facenda's voice described as "legendary", and that he, personally, would characterize Facenda's as a "legendary voice." Wolper Deposition Excerpt, attached to Facenda's Motion as Exhibit B, at 45. Further deposition testimony from Barry Wolper reads:

Q: As far as you know, did John Facenda have a distinctive voice?

A: Yes.

Q: As far as you know, did John Facenda have a voice that, as far as you're concerned, as the chief financial officer of NFL Films, has a real association with NFL Films?

A: Yes.

Q: As far as you know, is the voice of John Facenda well known among football fans?

A: Yes.

Q: And I'm not just talking about football fans in the Philadelphia area. I'm talking about football fans nationwide. Is that how you understood the question?

A: Yes.

. . .

Q: Ever hear him referred to as the voice of God?

A: Yes.

. . .

Q: Where did you hear him referred to as the voice of God?

A: I can't remember a specific incident but I've seen it many times ... I've seen articles. I can't remember what newspapers they might have been in or where that was—his

voice was referred to as the voice of God.

*Id.* a 42–44.

Robert Markopolous, the NFL producer of the Madden film which is the subject of this lawsuit testified at his deposition:

Q: ... When did you first know who John Facenda was?

A. When I was probably a kid.

Q: Watched the NFL films that he narrated?

A: Yes.

Q: Do you remember his voice?

A: Yeah.

Q: Had a distinctive voice?

A: Yes. I would say it's legendary.

Markopolous Deposition Transcript excerpt, attached to Facenda's Motion as Exhibit C at 19.

Moreover, certain lines of narration, as delivered by Facenda, "have achieved classic status," as NFL has expressed it, and are strongly associated not only with NFL Films, but with Facenda, personally. John Facenda, Jr., Deposition Transcript Excerpt, attached to the NFL's Response and Motion for Summary Judgment as Exhibit A at 148–150.

NFL presented Facenda's legacy to the public as something to be treated with reverence. In 1994, it released a video of compiled clips entitled "The Legendary John Facenda." or "The Legendary Voice of John Facenda." Sabol Deposition Transcript excerpt at 11. Sabol's text in that video described Facenda as "touching the hearts of millions" *Id.* at 35. It is also stated in the video that Facenda's was "a voice that will forever be associated with pro football." *Id.* at 36.

Further, NFL released an audio CD entitled "The Power and the Glory", a compilation of "[NFL] music and sound effects and John's voice." *Id.* at 22–23;

Wolper Deposition Testimony, *supra,* at 44–45. The largest writing on the back of the CD states: "Featuring the legendary voice of John Facenda and the music of Sam Spence." Reproduction of CD Cover, attached as Exhibit D to Facenda's motion.

Thus, although John Facenda is not a "legend" in the same category as, say, Hercules, or John Henry, Plaintiff has shown that he was, and remains, a very popular figure among football fans; that he was strongly associated with NFL Films; and that his voice/delivery is the major basis of his appeal.

## B. *The Contract Between Facenda and NFL Films*

Most of John Facenda's narration work for NFL Films was done pursuant to an oral agreement that he would be paid a certain amount for each program. In April, 1984, however, a few months before he passed away, Facenda entered a written agreement with NFL Films, which, as NFL wrote in the letter agreement, established a "blanket Release" for your work as a narrator within our various film and tape productions. Release, attached as Exhibit M to NFL's Response and Motion. The letter agreement was signed by John Facenda. *Id.*

Attached to the letter agreement was the form of a Standard Release, unsigned, but with John Facenda's initials in the upper left-hand corner. In relevant part, the Standard Release reads:

> In consideration of [blank space with dollar sign], I hereby grant to NFL Films, Inc., the unequivocal rights to use the audio and visual film sequences recorded of me, or any part of them, on a worldwide basis, in perpetuity and by whatever media or manner NFL Films, Inc., sees fit, provided, however, such

use does not constitute an endorsement of any product or service.

*Id.* at "Exhibit A."

It is not clear whether the Standard Release (which terminated with blank spaces for Mr. Facenda's signature, address, and Social Security Number, and for the date) was ever completed or signed. Nevertheless, the parties apparently agree that it establishes the permitted use for the recordings used in the Making of Madden. Although this is not an action for breach of contract, this Release has become significant for several reasons, as will appear in the discussion section of this Opinion.

## C. *"The Making of Madden NFL 06"*

In the summer of 2005, NFL Films created a 22 minute, 15 second production called "The Making of Madden NFL 06" ("The Making of Madden"). The subject of the production was the popular video game, Madden NFL 06, which simulates NFL football. The Making of Madden used 13 seconds of John Facenda's recorded voice, uttering three lines: (a) "Pro Football, the game for the ear and the eye"; (b) "This sport is more than a spectacle, it is a game for all seasons"; and (c) "Xs and Os on the blackboard are translated into imagination on the field." DVD of The Making of Madden, attached as Exhibit F to the NFL's Response and Motion.

In the production, Facenda's voice was somewhat distorted to sound computerized. *Id.* When Facenda recorded those lines, they were clearly intended to refer to NFL football itself. *See* Facenda, Jr., Deposition Transcript excerpt at 130–131. Nevertheless, the lines are juxtaposed against tape including video-game-like computer animation, as well NFL game footage.

The rest of The Making of Madden features endorsements by NFL football players, and interviews with creators of the Madden game. It describes the makers' efforts to reproduce electronically the motion of real football players, and the extensive use of NFL statistics to decide how each computerized player will perform, and well as the care taken in reproducing the appearance of elements such as the stadium and the players' uniforms. The production also describes the game's upbeat, youthful musical score, and includes interviews with musicians happy to be featured on the Madden soundtrack.

The Making of Madden aired on NFL's cable television station in August, 2006, shortly before the release date for Madden 06. At the end of the program, a "countdown" appeared on the screen, informing the viewer how many days were left before the game's release.

During the course of this litigation, NFL has described "The Making of Madden NFL 06" as a documentary. It has attached to its motion a large number of newspaper and magazine articles about Madden NFL, many of which reported the release of the 2006 version, and its enthusiastic reception by its fans. Appendix to NFL's Response and Motion.

Indeed, the articles tended to feature the game's realistic "motion capture" and use of player statistics, just as The Making of Madden did. *See, e.g.,* Sam Farmer, *Madden Obsession Turns NFL Pros into Real Gamers,* L.A. Times, Dec. 24, 2005, attached to NFL's Appendix as Exhibit 1 (explaining how Madden uses three-dimensional head scans of NFL players to create accurate likenesses); Nick Chordas, *Mad about "Madden"; Hugely Popular Video Football Game Returns for its 17th Edition,* Columbus Post–Dispatch, Aug. 21, 2006, attached to Appendix as Exhibit 2 (explaining how color commentary is added

to review new plays each year); Kevin J. Delany, *Is it Real ... or is it Madden?,* Wall St. Journal, Sept. 20, 2004, attached to Appendix as Exhibit 5 (on motion capture and the creation of stadium settings). NFL has taken the position that, given the similarity in the material covered, the promotional aspects of The Making of Madden are no different from the promotional aspects of a positive newspaper review.

Facenda, however, has pointed out that, unlike the Wall Street Journal or the L.A. Times, the NFL had a financial interest in the sale of the Madden NFL game. In December, 2004, the NFL entered a licensing agreement with Electronic Arts, which produces the Madden games. In it, the NFL gave Electronic Arts (a) the exclusive right to use NFL trademarks in its action simulation games and other products; and (b) its agreement to provide "other media, promotional and marketing support." Agreement, attached as Exhibit M to Facenda's Motion, at Bates Stamp 0000778.

The royalties to be paid the NFL were redacted from the copy of the agreement which was provided in discovery, since discovery has been bifurcated between liability and damages. However, as Timothy Langley, an NFL licensing manager, stated at his deposition: "[T]he more copies [of Madden NFL 2006] that are sold, the more money we would make." Langley Deposition Transcript, attached as Exhibit N to Facenda's Motion, at 35.

Further, Facenda has shown the Court other material obtained in discovery from NFL which suggests that, in-house, The Making of Madden was always considered a promotional piece rather than a documentary. First, the Electronic Arts technicians and directors who appeared in The Making of Madden signed NFL Films "talent agreements" in connection with

what the NFL termed "Advertisements". Thus:

In consideration of the Compensation and Talent's appearance in the Advertisements ... Talent grants NFLF ... the unlimited right ... to Talent's [Licensed Identity] in connection with the Advertisements.

Exemplar Talent Agreement, attached as Exhibit O to Facenda's Motion.

Moreover, Markopolous, the producer of The Making of Madden, referred to the production as promotional in this July 19, 2005, e-mail:

I was wondering if you can look into the EA Madden s how for us to see if we can use the madden music. We would like to use their music throughout the show to promote the game with the actual music from the game. **The whole show is a "making of" show so all it does it promotes madden.** Please let me know if this is possible.

E-mail, attached as Exhibit Q to Facenda's Motion. [Emphasis supplied; capitalization irregularities and minor typographical errors in original].

At his deposition, Markopolous's attempt to explain this e-mail was not particularly lucid:

Q: So, would you agree or disagree with the statement that the only thing this program did was promote the Madden video game?

A: As I said, I guess I would disagree because I did more than just—it was there to entertain and enlighten people. It was a documentary to provide facts.

. . .

Q: When you say at the end [of your e-mail] that all it does is promote Madden, I assume that what you're referencing there is Madden the

game as opposed to Madden the man?

A: We're talking about promoting the game as an entirety of the show that we are creating [sic.]. Is there any chance I could use the bathroom?

Markopoulos Deposition Excerpt, *supra*, at 53.

Wolper also disseminated an e-mail describing "The Making of Madden" as the "Madden Promo." At his deposition, he was asked:

Q: What did you describe—how did you describe the Madden game in the subject line of your e-mail that you sent out in August, 2005?

A: It says subject Facenda voice in Madden '06 promo.

Q: What did you mean by promo?

A: I don't recall.

Q: Well, is promo, the way you've referred to it, is that a term that's synonymous with documentary?

A: Generally not.

Q: What is it usually synonymous with?

A: It's short for promotion.

Wolper Deposition Excerpt, *supra*, at 65–66.

Charles Coplin, the Vice President of Programming for the NFL Network wrote this e-mail to his consumer products group with respect to the Madden game: "All good but not the major thing they promised. That promise is what motivated the dollars we spent on the *making of* show." E-mail, attached as Exhibit R to Facenda's Motion. At his deposition, Coplin said that he could not recall what "promise" he referred to. Charles Coplin Deposition Excerpt, attached as Exhibit K to Facenda's Motion, at 34. When asked, however, whether "a promise made by EA Sports

[was] what motivated the dollars spent on the making of the show", Coplin replied: "It's not true." *Id.* at 39.

### D. *Evidence of Consumer Confusion*

John Facenda, Jr., admitted at his deposition that he was not personally aware of any viewer of The Making of Madden who was misled:

Q: So my question is, is it the case that people who know your father is dead would be could be misled into thinking he endorsed Madden 2006?

A: No, but they could be misled to think that I did as Executor of his Estate and whatever input I would have in that decision-making, should there be one.

Q: Do you know anyone who has that view?

A: No.

Facenda Deposition Transcript, *supra,* at 94.

And further:

Q: [Paragraph 58 of your Complaint] says "viewers were misled." I'm asking again because I want to be sure we're clear on this, do you have any factual basis other than the fact that your father's voice was used for Paragraph 58?

A: I do not.

. . .

Q: And you have no other basis for saying it either, correct, you personally?

A: Me personally do not. [Sic.]

*Id.* at 102.

Facenda's expert, Jon Albert Levy (who apparently goes by "Jon Albert"), testified that viewers would "probably" believe, mistakenly, that there was an affiliation between Mr. Facenda and the Madden game. Jon Albert Levy Deposition Excerpt, attached to NFL's Reply and Motion as Exhibit B, at 264. However, when counsel for NFL attempted to clarify this statement, the following exchange took place:

Q: The connection that [counsel for Facenda] was referring to is the implied connection that somehow Mr. Facenda and/or his estate are associated with, approve, or endorse the Madden NFL video game. Correct?

A: Correct.

Q: And that's an implied message. Correct?

A: Yes.

Q: And you have no evidence whatsoever as to what anybody who saw the program other than yourself actually thought upon seeing the program. Correct?

A: No. I would have no evidence of what they thought.

*Id.* at 265.

## II. *Legal Standards*

### A. *Summary Judgment*

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party. *Anderson v. Liberty Lobby, supra* at 477 U.S. 242, 255, 106 S.Ct. 2505, 2511,

91 L.Ed.2d 202 (1986); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, at 323, 106 S.Ct. 2548.

At the hearing on these cross-motions for summary judgment, both parties agreed that they had no need of further discovery, and that the Court could resolve all the liability issues on the evidence already before it. Transcript of April 9, 2007, Hearing ("Hearing Transcript") at 6–9.

### B. *Other Areas of Law*

Each count in Facenda's complaint involves a different area of the law. The law respecting each count will be set forth as a part of the relevant discussion of that cause of action.

### III. *Discussion*

### A. *The Blanket Release is Not a Defense*

### 1. *Undistorted Language Can Constitute An Endorsement*

■ Before determining whether the NFL is liable under the causes of action asserted by Facenda, I will consider the NFL's argument that the Release signed by John Facenda constitutes a complete defense to this action. The NFL maintains that, under this Release, it was free to "reuse recorded sequences of Mr. Facenda reading its scripts, in whole or in part, so long as it did not edit those sequences into something that made up,

formed or composed an act of endorsement by Mr. Facenda of a product or service." Memorandum in support of NFL's Response and Motion at 16; *see, also,* Hearing Transcript, at 14.

Under NFL's interpretation, in other words, the use of Facenda's recordings was permissible because the words were not spliced and edited to say: "I love Madden NFL!" Nevertheless, Robert Markopolous, the NFL Films producer, testified that he did not believe the Release permitted him to use Facenda's voice clips in any commercial:

> MARKOPOLOUS: If I were to do a commercial, I wouldn't use his voice.
>
> Q: Why not?
>
> A: Because from what I understood, you could not do that.

Markopolous Deposition Excerpt, *supra,* at 31.

Further, the plain language of the Release ("provided, however, that such use does not constitute an endorsement of any product or service") did not specify that for the use to be precluded, the words had to be distorted. NFL acknowledges that the purpose of the endorsement exclusion was to prevent NFL from interfering with John Facenda's successful career as a product spokesperson. Memorandum in Support of NFL's Response and Motion at 7, *citing* Facenda, Jr., Deposition Excerpt, *supra,* at 42.[2]

Given this, the Release only makes sense if it precludes all use of Facenda's films to promote a product or service. Any use of Facenda's films in an advertise-

---

**2.** "[H]e was most likely thinking of any other film work that he had scripts for that it wouldn't interfere with him doing—by endorsing a product with NFL Films that that would limit him from doing product for, you know, a thing for Ford or whatever that he might have." *Facenda, Jr.* excerpt.

ment for General Motors, for example—distorted or not—would interfere with his career, if he had chosen to become a spokesperson for Ford. Thus, the Release can be a defense in this action only if The Making of Madden is found not to be a commercial work.

### 2. *"The Making of NFL" Is Commercial in Nature*

NFL has argued that The Making of Madden was a documentary, rather than a commercial or promotional piece. At his deposition, Robert Markopoulos denied that the program was promotional: "[I]t was there to entertain and enlighten people. It was a documentary to provide facts." Markopoulos Deposition Excerpt, *supra*, at 53. When asked at his deposition whether the program was "intended to promote the sale of Madden the video game," Barry Wolper replied: "No." Wolper Deposition Excerpt, *supra*, at 11.

Nevertheless, a number of factors convince me that The Making Of Madden was promotional and not documentary or journalistic. First, the NFL documents attached by Facenda in support of his motion—the Talent Agreements, the e-mails from Markopoulos and Wolker—indicate that NFL itself never considered the program a documentary, and that its promotional aspects were intended to predominate. In the quote above, Markopoulos was refuting his own e-mailed statement that "all [the show] does is promote Madden".

Secondly, as is also discussed above, NFL has a direct financial interest in Madden's success. Thus, it lacks the journalistic independence typical of the maker of a documentary. Indeed, since the parties appear to agree that the NFL Players' Association has a deal with Electronic Arts, it seems that everyone involved in The Making Of Madden had the same

direct financial interest in the game's sales: the players who appeared in the program, extolling the game's features, the artists interviewed about the creation of the game, and the bands that had provided background music.

Thirdly, and as a related matter, no one in The Making of Madden had a negative thing to say about the game. By contrast, many of the newspaper and magazine articles provided by NFL reported unfavorable points of view, along with the glowing reviews.

The LA Times article, for example, opened with a quote from Jerome Bettis, former running back for the Pittsburgh Steelers, who had to "quit [Madden] cold turkey" because of compulsive playing: "I was up all night, all day. I just realized that, hey, I've got to do some other things with my time. It can be an addiction, man." L.A. Times Article, *supra*. The Wall Street Journal described some design "snafus": "In the 2004 edition, . . . players could block a field goal every time if they chose a certain defensive formation." Wall Street Journal Article, *supra*. The Columbus Dispatch mentions a "longstanding criticism that Madden offers little more than roster updates with each $50 edition" and a perception held by some that Madden's domination of the industry "gives EA the opportunity to rest on its laurels and not to innovate." Columbus Dispatch Article, *supra*.

Commentary in The Making of Madden, by contrast, is of this kind: "The Madden franchise . . . is mind-boggling"; "Madden has become the king of all video games"; and "Madden is the greatest football game franchise ever." The Making of Madden script, attached to Facenda's Motion as Exhibit I.

Finally, I have taken into consideration the fact that The Making of Madden was

aired within weeks of the release date for Madden NFL '06, as well as the use of the "countdown clock." These things, standing alone, might not be enough in themselves to distinguish The Making of Madden from a journalistic work, but they are suggestive in connection with the other factors I have mentioned.

I conclude, therefore, that The Making of Madden was commercial in nature, rather than documentary or journalistic. John Facenda's vocal "appearance" on the tape would therefore constitute an endorsement of the Madden NFL 06 game. Since the Blanket Release does not give NFL the right to use Facenda's tapes for product endorsement, it is not a defense to this action.

**B. Unauthorized Use of Name or Likeness, 42 Pa.C.S.A. § 8316**

**1. Facenda's Action Is Not Preempted By Copyright Law**

Plaintiffs maintain that NFL violated Mr. Facenda's (and now, his estate's) right to control the use of his identity, in violation of 42 Pa.C.S.A. § 8316. This Pennsylvania statute, entitled "Unauthorized Use of Name or Likeness," provides, in pertinent part:

> Any natural person whose name or likeness has commercial value and is used for any commercial or advertising purpose without the written consent of such natural person or the written consent of any of the parties authorized in subsection (b) may bring an action to enjoin such unauthorized use and to recover damages for any loss or injury sustained by such use.

42 Pa.C.S.A. § 8316(a). "Name or likeness" includes "voice." § 3816(e).

Subsection (b), entitled "Parties Authorized to Bring Action" includes (1) the natural person; (2) the person's parent or guardian, if the person is a minor; (3) the person's estate, if the person is deceased; or (4) any other person, firm or corporation authorized as a licensor.

The NFL maintains that the application of this statute is preempted by federal copyright law. Statutes which protect rights which are "equivalent to any of the exclusive rights" in the Copyright Act respecting "works of authorship that are fixed in a tangible medium of expression" are, indeed, preempted by the Copyright Act. 17 U.S.C. § 301(a), and see Laws v. Sony Music Entertainment, Inc., 448 F.3d 1134, 1141 (9th Cir.2006) ("We think it is clear that federal copyright law preempts a claim alleging misappropriation of one's voice when the entirety of the allegedly misappropriated vocal performance is contained within a copyrighted medium").

Here, however, NFL does not own an unrestricted copyright in Facenda's recordings. Instead, NFL's use of the recordings is limited by the Blanket Release's provision precluding their use to endorse a product or service. Because of this limitation, the copyright law would not be relevant to NFL's use of Facenda's voice in the Making of Madden. Therefore, copyright law could not preempt the application of the Pennsylvania statute.

The Court of Appeals for the Ninth Circuit made exactly this point in the Laws case, cited above. In that case, Elektra/Asylum Records held the copyright to certain songs recorded by singer Debra Laws. When Sony used samples from Laws' recordings in a new song by different artists, Laws sued Sony under the California misappropriation statute. As noted above, the Laws court found that the statute was preempted because the copyright to Laws' songs was held by Elektra, which granted Sony the right to use them.

In reaching its decision, however, the *Laws* court compared the facts before it to those in *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905 (7th Cir.2005), in which the Court of Appeals for the Seventh Circuit held that a model's suit to protect her publicity rights in photographs was not preempted by copyright law. The *Laws* court wrote:

> *Toney* differs from this case in a significant way: Toney brought her right of publicity claim against L'Oreal U.S.A., the Wella Corp., and Wella Personal Care of North America, Inc., which each at some point held the copyright and **had agreed not to use Toney's likeness after 2000.** The facts of this case would be analogous to *Toney* if Laws had brought her right of publicity claim against Elektra, which holds the copyright to the song and **may have agreed to licensing limitations.**

448 F.3d 1134, 1142 at n. 4. (Emphasis supplied).

Under the *Laws* reasoning, therefore, Facenda's case is analogous to Toney's. Facenda, like Toney, sued the holder of the copyright to his work, to enforce a limitation in that right.[3] Like Toney, his case for misappropriation of identity is not preempted by the copyright laws.

## 2. *NFL Has Violated 42 Pa.C.S.A. § 8316*

As set forth above, 42 Pa.C.S.A. § 8316 requires the following: (a) a natural person whose name or likeness has commercial value; (b) the use of the name or likeness for a commercial or advertising purpose; and (c) the absence of written consent by the natural person or that person's parent, guardian, estate or licensing agent. The statute has been cited in only one published case, *Tillery v. Leonard & Sciolla, LLP*, 437 F.Supp.2d 312 (E.D.Pa. 2006). There, recovery was denied on the basis that there was insufficient evidence of commercial value in the plaintiff's name, and because the terms of the plaintiff's consent to the use of his name was unclear.

Here, the commercial value of John Facenda's voice is not disputed. I have already decided that the Making of Madden was a "commercial or advertising" vehicle, and that, accordingly, NFL's use of Facenda's recordings was a commercial use, outside the terms of Facenda's consent, as embodied in the Blanket Release. Therefore, Facenda has shown a right to recover under 42 Pa.C.S.A. § 8316.

NFL argues, however, that recovery is precluded under the doctrine of "incidental use." This doctrine provides that merely incidental or isolated uses of a name or likeness are not actionable under a right of publicity statute. *See Preston v. Martin Bregman Productions, Inc.*, 765 F.Supp. 116, 120 (S.D.N.Y.1991). Whether a use falls within the doctrine of incidental use is determined by the role that the use of the plaintiff's name or likeness played in the main purpose and subject of the work at issue. *Id.* at 119.

In *Preston*, a woman sought compensation for her nine-second appearance in a New York street scene in the opening of the movie Sea of Love, while engaged in

---

**3.** This aspect of the *Laws* and *Toney* cases also shows the fallacy in NFL's argument that right of publicity cases involving voice recordings are always preempted by copyright law, while cases involving photographs (such as *Toney*) may not be. It is clear from the above-quoted Footnote 4 that, according to the *Laws* court, if Elektra had violated limitations in the use of Laws' recordings, and Laws had sued to enforce them, her case—like Toney's, and like Facenda's—would not have been preempted. Thus, in these cases, preemption depended not on a voice/non-voice distinction, but on the parameters of the copyright held by the defendant.

streetwalking. The movie, starring Al Pacino and Ellen Barken, concerned a police officer becoming romantically involved with a murder suspect. Thus Preston's appearance was not found to have a significant role in the movie as a whole.

NFL argues that the thirteen seconds of Mr. Facenda's film which were used are, like Preston's nine seconds, so insignificant as to constitute incidental use. Indeed, after Mr. Markopolous described Mr. Facenda's voice as "legendary" at his deposition, he was asked: "Is that one of the reasons why you wanted to use it in the program?" but he replied: "No." Markopoulos Deposition Transcript Excerpt, *supra*, at 19–20. Markopoulos said that the reason they did not use another reader for the words, was that they were on a very tight budget. *Id.* at 21.

However, Markopoulos also stated that his goal in designing the first part of The Making of Madden was "to parallel the video game versus the national game of football." *Id.* at 21. NFL deponents have agreed that John Facenda's "legendary" voice "will forever be associated with pro football." Even taking into account the importance of the script that Facenda narrated, it is difficult to believe that the "voice of God," was used only incidentally. It is more credible that his film clips were selected to enhance the parallel between Madden NFL and NFL football.

It is apparent that John Facenda's voice played a much more significant role in the main purpose and subject of The Making of Madden than Preston's appearance did in Sea of Love. Put another way, although Facenda's appearance was brief, it added some commercial value to The Making of Madden. *See Aligo v. Time–Life Books, Inc.,* 1994 WL 715605 at *3 (N.D.Cal. Dec. 19, 1994) (one rationale for denying compensation for incidental use is that an incidental use has no commercial value). I

conclude, therefore, that the doctrine of incidental use does not apply here. For this reason, NFL is liable to Facenda under 42 Pa.C.S.A. § 8316.

### C. *The Lanham Act*

#### 1. *The Applicable Law*

The provision of the Lanham Act which is relevant to this case reads:

**§ 1125  False designations of origin, false descriptions, and dilutions forbidden**

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any work, term, name symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

A celebrity is entitled to vindicate property rights in his or her identity under this section of the Lanham Act, because he has an economic interest in his identity akin to that of a traditional trademark holder. *White v. Samsung Electronics America, Inc.,* 971 F.2d 1395 (9th Cir.1992), *cert.*

*denied* 508 U.S. 951, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993); *Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir.1992); *Parks v. LaFace Records*, 329 F.3d 437, 445 (6th Cir.), *cert. denied* 540 U.S. 1074, 124 S.Ct. 925, 157 L.Ed.2d 744 (2003); 5 *McCarthy on Trademarks and Unfair Competition* § 28:15 ("Lanham Act § 43(a) and false endorsement") (4th ed.2007).

The Courts of Appeal for the Ninth and Sixth Circuits have said that a celebrity endorsement case arises under subsection § 1125(a) (1)(A), which governs misleading claims of affiliation. The Court of Appeals for the Sixth Circuit has explained:

> In order to prevail on a false advertising claim under § 43(a), a celebrity must show that use of his or her name is likely to cause confusion among consumers as to the "affiliation, connection, or association" between the celebrity and the defendant's goods or services or as to the celebrity's participation in the "origin, sponsorship, or approval" of the defendant's goods or services. *See* 15 U.S.C. § 1125(a)(1)(A).

*Parks v. LaFace Records, supra,* at 446; *Waits v. Frito–Lay, Inc., supra.*

District Courts in the Third Circuit have agreed. *Dorsey v. Black Pearl Books, Inc.*, 2006 WL 3327874 at *6 (D.N.J. Nov. 14, 2006); *Seale v. Gramercy Pictures*, 964 F.Supp. 918, 930 (E.D.Pa. May 15, 1997) (quoting *only* § 1125(a)(1)(A), and not (B), in a celebrity endorsement case), *aff'd* 156 F.3d 1225 (3d Cir.1998), (Table, No. 97–1726). This is consistent with the statutory language of § 1125(a)(1)(A), which refers to the affiliation of "such person" (here, Madden NFL 06) with "another person" (here, Facenda). In light of the case authority and the plain language of the statute, it is clear that this case arises under subsection § 1125(a)(1)(A).

Thus, under the language of § 1125(a)(1)(A), Facenda must show a like-

lihood of confusion, mistake, or deception as to his affiliation with Madden NFL. It is well established in this Circuit that in a § 1125(a)(1)(A) case, likelihood of confusion is analyzed through the multi-factor analysis first set out in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir.1983). *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211 (3d Cir.2005); *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir.2004); *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466 (3d Cir.1994); *Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*, Civ. A. No. 06–4003, 2007 WL 1199662 (E.D.Pa. Apr. 18, 2007); *Dorsey v. Black Pearl Books, Inc., supra.* The one exception to this, *Seale v. Gramercy Pictures, supra,* will be discussed below.

The *Lapp* factors, as adapted by the Court of Appeals for the Third Circuit in *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000), for broader application, are:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers, whether because of the near identity of the products, the similarity of function, or other factors; and (10) any other factors sug-

gesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Kos Pharmaceuticals, Inc. v. Andrx Corp., supra,* at 369 F.3d at 709.

None of these factors is determinative in the likelihood of confusion analysis; instead, the factors must be weighed and balanced against one another. *Id.* Because each factor is weighed separately, the factors may be given different weights depending on the particular factual setting. *Id.* A district court should use the factors that are appropriate to a given situation. *Id.* However, where a court finds that certain of the *Lapp* factors are inapplicable in a particular case, it must explain its choice not to apply those factors. *Id.* at 711.

In *Dorsey v. Black Pearl Books, Inc., supra,* a case brought by a well-known R & B singer and producer regarding a photograph used on the cover of a paperback book (described by the publisher as "gritty and sexy", and by Nick Chiles in a New York Times editorial as "smut"), the District Court for the District of New Jersey also looked to a set of factors designed in the Ninth Circuit particularly for celebrity endorsement cases. The factors in this test are:

> (1) the level of recognition that the plaintiff has among the segment of the society for whom the defendant's product is intended; (2) the relatedness of the fame or success of the plaintiff to the defendant's product; (3) the similarity of the likeness used by the defendant to the actual plaintiff; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent on selecting the plaintiff; and (8) likelihood of expansion of the product lines.

2006 WL 3327874 at *7, *quoting Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1007–1008 (9th Cir.2001).

Notably, since all factors are to be considered separately, evidence of actual confusion is not essential. In *Fisons Horticulture v. Vigoro Industries, Inc., supra,* the Court of Appeals for the Third Circuit reversed a District Court's finding for a defendant after a bench trial on the basis that the plaintiff had not shown actual confusion: "As we stated in *Lapp,* 'once a trademark owner demonstrates likelihood of confusion, it is entitled to injunctive relief' ". 30 F.3d at 476.

### 2. *Seale v. Gramercy Pictures; The Two Element Test*

NFL has pressed upon me the fact that the *Lapp* factors were not applied in the only celebrity endorsement case affirmed by the Court of Appeals for the Third Circuit. In that case, *Seale v. Gramercy Pictures,* 964 F.Supp. 918 (E.D.Pa.1997), *aff'd,* 156 F.3d 1225 (3d Cir.1998) (Table, No. 97–1726), Bobby Seale sued Gramercy Pictures for its portrayal of him in a fictional movie based on the activities of the Black Panther Party. He also sued under the Lanham Act for Gramercy's use of two photographs of the actor who portrayed him in the movie in a brochure accompanying a CD of the movie music, claiming that Gramercy's use of the photos constituted a misrepresentation of endorsement or affiliation. 964 F.Supp. at 930.

The Honorable Raymond J. Broderick, who decided the case, did not mention the *Lapp* factors. Instead, he wrote:

> A claim for false advertising under the Lanham Act requires that a plaintiff prove two discrete elements: (1) the context of the use contains a message of the plaintiff's endorsement, approval or affiliation; and (2) that the message is false or misleading. If the defendant's

use does not on its face contain a clear message of endorsement, [the] plaintiff must produce evidence, usually in the form of market research or consumer surveys, showing exactly what message customers received from the defendant's ad. Once that message is ascertained, plaintiff must then prove the second element, that the message is false or misleading.

*Id.,quoting* J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 5.4[B] (2) (insert 3/96). He added: "In other words, 'it is necessary to prove that the buying public was actually deceived in order to recover damages under § 43(a) of the Lanham Act.'" *Id.* at 930–931, *citing Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir.1981).

NFL maintains that Facenda must pass the two-element test set forth in *Seale*, proving that the use of his voice conveyed a message of his endorsement of Madden NFL 06. The reason for this, according to NFL, is that Facenda has alleged an implied falsehood—i.e., a false implication of endorsement—rather than a direct falsehood, such as if Facenda's voice had said "I love Madden."

As NFL points out, in *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, the Third Circuit Court of Appeals affirmed the District Court's dismissal of a Lanham Act case, writing:

Where, as here, a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers. It is not for the judge to determine, based solely on his or her own intuitive reaction, whether the advertisement is deceptive. Rather, ... the question in such cases is—what does the person to whom the advertisement is addressed find to be the message? ... That is, what does the public perceive the message to be?

960 F.2d 294, 297–298 (2d Cir.1992). (Quotation to Second Circuit authority omitted).

The *Smithkline Beecham* court rebuffed the appellant's attempt to point to circumstantial evidence,[4] writing:

Appellant's criticism of the District Court's findings misconstrues the proper role of consumer survey evidence in the analysis of implied falsehood claims. Generally, before a court can determine the truth or falsity of an advertisement's message, it must first determine what message was actually conveyed to the viewing audience.... In other words, in determining whether an advertisement is likely to mislead or confuse, the district court may consider these [circumstantial] factors after a plaintiff has established that a not insubstantial number of consumers hold the false belief allegedly communicated in the ad. Absent such a threshold showing an implied falsehood claim must fail.

*Id.* at 298. (Quotation to Second Circuit authority again omitted).

Further, in *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.*, 19 F.3d 125 (3d Cir.1994) the Court of Appeals for the Third Circuit affirmed a District Court's finding that a plaintiff's evidence was inadequate to show that a false message was conveyed:

If a plaintiff proves a challenged claim is literally false, a court may grant relief

---

**4.** Specifically, those factors were (1) the general commercial context, or sea of information in which consumers are immersed; (2) the defendant's intention to harness public misperception; (3) the defendant's prior advertising history; and (4) the sophistication of the advertising audience. 960 F.2d at 298.

without considering whether the buying public was misled. . . . If a plaintiff does not prove the claim to be literally false, he must prove that it is deceptive or misleading, which depends on the message that is conveyed to consumers. As the district court noted, the success of the claim usually turns on the persuasiveness of a consumer survey. The factfinder must determine whether the public was, in fact, misled. . . . Hence [a plaintiff] cannot obtain relief by arguing how consumers *could* react; it must show how consumers *actually do* react. 19 F.3d at 129–130 [citations omitted; italics in original]. *See also Labware, Inc. v. Thermo Labsystems, Inc.*, Civ. A. No. 04–2545, 2005 WL 1541028 at *10 (E.D.Pa. 2005) ("Having failed to show literal falsity, LabWare must prove actual deception.").

On the basis of this authority, NFL maintains that the distinction between a subsection (A) case and a subsection (B) case is not relevant here. Hearing Transcript at 66. Instead, the distinction between an express and an implied falsehood is crucial. Counsel for NFL stated at oral argument:

> The threshold issue that you are faced with at this point on this summary judgment motion is—was the message even communicated. . . . You don't get to the *Lapp* factors until you show that the message was communicated. How do we know that? *Seale* was an (a)(1)(A) case . . . [and] it simply did not matter.

*Id.* at 71.

### 3. *The Lapp Factors Apply Here Rather Than The Two–Element Test*

██ I have concluded that Facenda needs to show only a likelihood of confu-

sion to prevail. Other than *Seale*, the trademark confusion and celebrity endorsement cases which are decided under § 1125(a) (1)(A) require a showing of likelihood of confusion, and are analyzed through *Lapp*, or *Lapp*-style tests, under which actual confusion is only one of many factors. Further, other than in *Seale*, the two-step analysis requiring the showing of a deceptive message has only been applied to claims under § 1125(a) (1)(B), alleging false assertions in advertising, such as the *Johnson & Johnson* cases. As I will now discuss, the language of the Lanham Act, the caselaw, and treatise authority all indicate that *Seale* was an anomaly, and that the *Lapp* factors apply in this case.[5]

### a. *The Plain Language Of The Statute Indicates That The Lapp Factors Apply*

The plain language of § 1125(a)(1)(A) does not require proof of actual deception: it requires the showing of a "likelihood" of confusion, mistake or deception. Subsection § 1125(a)(1)(B), on the other hand, does not have the "likelihood" language, instead requiring a "misrepresentation." Because the two subsections of the statute set forth different standards, it is not possible to accept NFL's argument that the distinction between an (A) case and a (B) case is irrelevant in deciding what a plaintiff must prove.

NFL has suggested that, in a subsection (A) case, the two-point showing required in *Seale* is preliminary to the application of the *Lapp* factors. However, this approach is unworkable. On a practical level, there is no difference between showing the communication of a false message and showing

---

**5.** As a District Court case, *Seale* is not binding here. The decision was affirmed by the Court of Appeals without decision, so there is no way to know which issues were a part of the appeal. *Seale* has never been cited for the principle in question here.

actual deception. That is why, in *Seale*, Judge Broderick set forth the two element test and immediately afterwards wrote: "*In other words* it is necessary to prove that the buying public was actually deceived." Therefore, to impose the requirement of showing the communication of a false message upon a subsection (A) plaintiff is to impose upon him more than the Lanham Act requires.

Indeed, making the communication of a false message a threshold showing is equivalent to making the "actual confusion" *Lapp* factor determinative. A plaintiff could never progress to consideration of the other factors until "actual confusion" was proved. This approach was flatly rejected by the Court of Appeals for the Third Circuit in *Fisons*, a subsection (A) case.

Here, again, NFL has attempted to accommodate the subsection (A) language into its theory by suggesting that Facenda's two-point threshold showing need only prove a likelihood of confusion, rather than actual confusion. This brings us back to *Lapp*, which is always used to determine likelihood of confusion. Moreover, this approach is completely unprecedented. *Seale*, required proof of actual deception, not a likelihood of confusion. And, if *Seale* is removed from the mix, there exist only subsection (A) cases, which are assessed for likelihood of confusion by means of multifactor tests; and subsection (B) cases involving implied messages, in which proof of actual deception is required.

b.  *The Caselaw Indicates That The Lapp Factors Apply*

Both *Johnson & Johnson* cases fell squarely under subsection (B), because they involved allegations of false advertising, and not trademark confusion. In *Smithkline Beecham*, Johnson & Johnson alleged that antacid commercials empha-sizing that TUMS contained calcium rather than aluminum gave viewers the mistaken impression that ingestion of TUMS resulted in a nutritional benefit and that competitors' antacids were unsafe. 960 F.2d at 296. In *Rhone–Poulenc*, the plaintiff argued that commercials for Extra–Strength Maalox proclaiming it "the strongest antacid there is" misled consumers into thinking that it was a superior treatment for acid indigestion. 19 F.3d at 126. In these cases, a showing of actual deception was required.

Similarly, in *Labware, Inc. v. Thermo Labsystems, Inc., supra*, the plaintiff alleged that the defendant engaged in false advertising by misrepresenting the capabilities of one of its products, and displaying an inaccurate bar graph in an advertisement. 2005 WL 1541028 at *1. It was, said the court, a case involving an alleged misrepresentation of "the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities." *Id.* at *9. This is the language of subsection (B). As in the *Johnson & Johnson* cases, a showing of actual deception was required.

Language in other Third Circuit cases indicates that this is not a coincidence. In *Santana Products, Inc. v. Bobrick Washroom Equipment*, 401 F.3d 123 (3d Cir. 2005), the Court of Appeals wrote:

> To assert a claim for **false advertising** under § 43(a) of the Lanham Act, the plaintiff must prove that the defendant
>
> used in commerce any word, term, symbol or device, or any combination thereof, or any false designation or origin, false or misleading description of fact, or false or misleading representation of fact, which . . .
>
> In commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another per-

son's goods, services, or commercial activities ...

15 U.S.C. § 1125(a). The plaintiff must prove that the commercial message is either literally false or, if not literally false, literally true or ambiguous with the tendency to deceive consumers.... Otherwise, the plaintiff must prove 'that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience.'

*401 F.3d at 136.* (Bold supplied; elision from Lanham Act in original).

Thus, in explaining when the express/implied falsehood distinction is used, the *Santana* court glided right over the subsection (A) language. *See, also, GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp.* 197 Fed. Appx. 120, 123 (3d Cir.2006): "The elements of a Lanham Act case for **false advertising** are ... that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience" (emphasis supplied).

Conversely, all subsection (A) trademark infringement cases use the *Lapp* factors. *See, e.g., Century 21 Real Estate Corp. v. Lendingtree, Inc., supra; Kos Pharmaceuticals, Inc. v. Andrx Corp., supra; A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198 (3d Cir.2000); *Fisons Horticulture, Inc. v. Vigoro Industries, Inc., supra; Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc., supra; Basketball Marketing v. FX Digital Media,* Civ. A. No. 04–1733, 2006 WL 616284 (E.D.Pa.2006); *Etonic Worldwide, LLC. v. Kinetic Sports, Inc.,* 2005 WL 3527249 (D.N.J.2005); *Bijur Lubricating Corp. v. Devco Corp.,* 332 F.Supp.2d 722 (D.N.J. 2004); *Pa. Business Bank v. Biz Bank Corp.,* 330 F.Supp.2d 511 (E.D.Pa.2004). *Dorsey v. Black Pearl,* as described above,

is a celebrity endorsement case, in which the *Lapp* factors were applied.

Subsection (A) trademark infringement actions brought in other circuits are also analyzed for likelihood of confusion by means of multifactor tests. *Nautilus Group, Inc. v. ICON Health and Fitness, Inc.,* 372 F.3d 1330 (Fed.Cir.2004) (applying Ninth Circuit law); *Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.,* 934 F.2d 1551 (11th Cir.1991); *Orient Express Trading Co., Ltd. v. Federated Department Stores, Inc.,* 842 F.2d 650, 654 (2d Cir.1988); *Fibermark, Inc. v. Brownville Specialty Paper Products, Inc.,* 419 F.Supp.2d 225 (N.D.N.Y.2005).

As previously noted, the celebrity endorsement cases—with the exception of *Seale,* are also so analyzed. *Parks v. LaFace Records, supra; Downing v. Abercrombie & Fitch, supra; Waits v. Frito-Lay, supra.*

A review of the caselaw, therefore, strongly suggests that a § 1125(a)(1)(A) case like Facenda's is subject to a multifactor analysis under the *Lapp* factors, and that a showing of actual confusion or deception is only one factor to be considered.

### c.   The McCarthy Treatise

The *Seale* court correctly identified the case as one falling under subsection (A). 964 F.Supp. at 930. Nevertheless, it required proof of actual deception. *Id.* In doing so, the court relied upon a quote from the 1996 insert to the well-respected treatise, J. Thomas McCarthy's "The Rights of Publicity and Privacy." *Id.* The quoted section does, indeed, speak of the need for proof of actual deception in an endorsement case. *Id.* Although the role of a treatise is to compile and reflect the state of the law, this statement appears to contradict the language of the Lanham Act, as well as the case law, as set forth above.

Fortunately, the significance of this confusing language in the 1996 insert is eliminated by the fact that the treatise, as it now exists, limits the application of the "two-stage rule" to subsection (B) cases. The "two-stage rule" is discussed in a section captioned "False representations as to the nature or qualities of goods and services—Methods of proof." 5 McCarthy on Trademarks and Unfair Competition § 27:55 (4th Ed.) (Westlaw Database MCCARTHY § 27:55, Updated March 2007). This section of the treatise cites only claims of false statements in advertising, and no trademark confusion or celebrity endorsement cases. *Id.*

A separate section of the treatise concerns "Lanham Act § 43(a) and false endorsement." *Id.* at § 28:15. This section mentions the multifactor tests employed by the Ninth and Sixth Circuits to assess a likelihood of confusion. *Id.* It does not mention the "two-stage" rule.

For the purposes of this decision, the significance of the change in the McCarthy treatise is that the primary basis for the *Seale* court's approach no longer exists. This further supports my conclusion that *Seale* is not valuable as precedent. I will apply a multifactor test here.

### 4. *Plaintiff Prevails Under A Multifactor Test*

■ Because the *Lapp* factors are designed for competing products, they cannot be applied in a celebrity endorsement case without a great deal of adjustment and reinterpretation of terms. For this reason, I will use the very sensible approach taken by the Honorable Joseph A. Greenaway, Jr., in *Dorsey, supra,* and apply the factors already adapted for celebrity cases by the Court of Appeals for the Ninth Circuit in *Downing v. Abercrombie & Fitch, supra.*[6]

### a. *Facenda Has a High Level Of Recognition Among the Segment Of Society To Whom Madden NFL 06 Was Marketed*

Facenda has come forward with evidence of a high level of recognition among the segment of society to which Madden NFL 06 was marketed. Whether the Madden audience is defined as football fans or computer football game players, these are the very people *most* likely to associate Mr. Facenda's voice with football and the NFL. This would even be true for younger fans who, while they might not know his name, would certainly recognize the voice as being "that guy on the old

---

**6.** The *Downing* factors, which were adapted from a multifactor test used in the Ninth Circuit for commercial trademark cases, roughly correspond to the *Lapp* factors. The first factor, level of recognition, is analogous to *Lapp* factor no. 8, "the extent to which the targets of the parties' sales efforts are the same," and is also related to *Lapp* factor no. 2, "the strength of the owner's mark." *Downing's* "relatedness of fame or success of the plaintiff to the defendant's product" is the equivalent of *Lapp* factor no. 9: "the relationship of the goods in the minds of consumers." The third *Downing* factor, "the similarity of the likeness used by the defendant to the actual plaintiff" corresponds, of course, to the first *Lapp* factor, "the degree of similarity between the owner's mark and the infringing mark." Evidence of actual confusion is a factor in both tests, as are marketing channels used, and the likely degree of purchaser care. *Downing's* "the intent of the defendant in selecting the plaintiff", is obviously analogous to *Lapp* factor no. 4, "the intent of the defendant in adopting the mark." Finally, *Downing's* "likelihood of expansion of the product lines" is something of a subspecies of *Lapp's* "factors suggesting that the public might expect the prior owner to manufacture a product in the defendant's market", as it seeks to explore the possibility that confusion might be deepened by the future use by either party of the plaintiff's image. *See, Downing,* 265 F.3d at 1008–9; *Dorsey, supra,* at 2006 WL 3327874 at *9.

NFL films", or even "that guy Chris Berman imitates on ESPN." [7]

The *Downing* case involved the use by a clothing company of an old photograph of surfers who had attained an iconic status, similar to Mr. Facenda's status as "the voice of God" in sports narration. The *Downing* made this analysis:

Appellants cite to a declaration submitted by surf historian, Steve Pezman. In the declaration, Pezman asserts that Appellants "are considered legends in the surf community and are still highly well-known and regarded." This declaration from a surf historian provides some evidence that Appellants' names and images enjoy a high level of recognition among average members of society as a whole. In addition, it is undisputed that Appellants are legendary surfers, and thus there is a reasonable inference that Appellants would be known to the young people to whom the Quarterly is directed and who would be purchasing Abercrombie's surf wear.

265 F.3d at 1008.

Although Facenda lacked an affidavit from a historian, the deposition quotes from NFL parties, as well as the packaging of the NFL video and CD, establish Facenda's status as legendary in his field, just as the *Downing* surfers were legendary in theirs. As in *Downing*, it can be reasonably inferred that Facenda would be known to the audience to whom The Making of Madden was directed, and who would purchase Madden NFL 06. Accordingly, this factor favors Facenda.

b. *The Relatedness Of The Fame Or Success Of The Plaintiff To The Defendant's Product*

This factor also favors Facenda. The clear link between John Facenda and the Madden NFL 06 game is NFL Football. Markopoulos, the creator of The Making of Madden stated at his deposition that his goal was to "parallel the video game versus the national game of football." Facenda's voice "which will forever be association with pro football" would forward that goal.

c. *The Similarity Of The Likeness Used By The Defendant To The Actual Plaintiff*

Since NFL used Facenda's actual recordings, this factor, too, favors Facenda. Facenda's voice was slightly altered to sound computerized. However, rather than obscuring Facenda's identity, this seems to have furthered Markopoulos's goal of linking NFL Football to the Madden computer game.

d. *The Defendant's Intent In Selecting The Plaintiff*

The *Downing* court said: "As to [this] factor, the relevant question is whether the Defendants intended to profit by confusing consumers concerning the endorsement of the Abercrombie apparel." 265 F.3d at 1008. I do not interpret this as requiring an intent to deceive, as much as an intent to profit from the celebrity's image, which the plaintiff has co-opted.

This factor favors Facenda. Despite certain NFL parties' claims to the contrary in their depositions, it is fairly clear that NFL intended to benefit from the association in viewers' minds between Facenda, and authentic NFL football. The fact that only 13 seconds of Facenda's recordings were used does not change my

---

**7.** We learned during the hearing on this motion that Mr. Facenda never actually said "the frozen tundra of Lambeau field." This news was as dismaying as the realization that Humphrey Bogart never said "Play it again, Sam" in Casablanca.

view as to NFL's intent, although it may be considered in a calculation of damages.

### e. Likelihood of Expansion of the Product Lines

This factor, too, tends to favor Facenda. It is apparent from the evidence provided by both parties that Madden issues a new version of its Madden NFL game every year. Further, Facenda has shown that NFL has an agreement with Electronic Arts, under which NFL profits from sales of the Madden game and, in turn, has agreed to provide Electronic Art products with "media, promotional and marketing support." Therefore, the question of NFL's right to use Facenda's recordings is likely to arise in the future.

### f. Marketing Channels Used

NFL has shown The Making of Madden only on its own NFL cable station. This is the channel (in both senses of the word) most likely to attract viewers who would recognize John Facenda's voice as being associated with football. This factor, therefore, clearly favors Facenda.

### g. Evidence of Actual Confusion

Unquestionably, this factor favors NFL. John Facenda, Jr., and his expert, Jon Albert Levy, both admitted that they did not know of even one viewer who wrongly believed that Facenda endorsed Madden NFL 06. Although, as I have emphasized, this is only one of many factors to be considered, it is not the least important.

### h. Likely Degree Of Purchaser Care

This is a neutral factor here, since neither party has provided any evidence as to the likely degree of purchaser care, or how that degree of care would influence this case.

### i. Analysis Of The Factors

The Lapp/Downing factors are not to be applied mechanistically. Dorsey, supra, at 2006 WL 3327874 at *9. Instead, the weight given to each factor in the overall picture must be assessed on an individual, fact-specific basis. Fisons, 30 F.3d at 476 n. 11.

Here, the most important failing in Facenda's case is the lack of evidence of actual confusion. All the usable evidence Facenda has produced comes from the NFL parties themselves. Therefore, there is no real evidence as to how NFL's use of Facenda's voice actually played out in the public.

This flaw, however, is not fatal to Facenda's Lanham Act cause of action. Where evidence of actual confusion exists, courts have weighed it heavily precisely because it is so hard to obtain. However, and for the same reason, courts have not always punished plaintiffs when no such evidence was produced. The Court of Appeals for the Third Circuit has said that direct evidence of consumer confusion is "difficult to find because many instances are unreported." Checkpoint Systems v. Check Point Software Tech., 269 F.3d 270, 291 (3d Cir. 1991), citing Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609, 612 (7th Cir. 1965) ("[S]ince reliable evidence of actual confusion is difficult to obtain in trademark and unfair competition cases, any such evidence is substantial evidence of likelihood of confusion.").

A District Court in the Eastern District of Michigan has stated the matter in the converse:

Because evidence of actual confusion is difficult to produce and frequently discounted as unclear or insubstantial, this factor is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circum-

stances indicate that such evidence should have been available.

*R.L. Polk & Co. v. INFOUSA, Inc.,* 230 F.Supp.2d 780, 791 (E.D.Mich.2002). The *R.L. Polk* court decided not to weigh heavily the plaintiff's lack of evidence of actual confusion against an "ultimate finding of likelihood of confusion." *Id.*

In this case, evidence of actual consumer confusion would be particularly hard to obtain because of the evanescent nature of a program shown just a few times on TV. This makes Facenda's case unlike Dorsey's, where multiple copies of a book were placed on stands, or *Downing,* where a clothing catalogue was widely dispersed.

Survey evidence can indicate actual confusion, if members of the viewing public are surveyed; or the likelihood of actual confusion, if a test panel is surveyed. *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.,* 921 F.2d 467, 475 (3d Cir. 1990). However, putting together and executing a survey is an expensive and dubious proposition. NFL pointed to the *Charles Jacquin* court's statement that the lack of a survey could permit a factfinder to infer that the plaintiff believed the results of the survey would be unfavorable. *Id.,citing Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571, 583 (D.N.J. 1985). The entire quote, however, states that such an inference could be made only when the plaintiff "has the financial resources" to conduct a survey. *Id.* That which is expected from a large commercial player like *Eagle Snacks* cannot necessarily be expected from the estate of an individual.

Further, just as the *R.L. Polk* court observed that anecdotal evidence of confusion is "frequently discounted as unclear or insubstantial," the same is true for surveys. The expense that a survey entails will go all for nothing if the court will not accept its methodology. *See Johnson &*

*Johnson v. Rhone–Poulenc, supra,* at 132–136, and *Urban Outfitters, Inc. v. BCBG Max Azria Group, supra,* at *16 ("[T]he Court finds that both [parties'] expert surveys are of limited weight in assessing whether Plaintiffs have shown a true confusion between the two marks").

Because it would have been difficult, cost-preclusive, and risky for Facenda to have obtained evidence of actual confusion, I cannot weigh the lack of this evidence too heavily against him. Instead, I conclude that this weakness in Facenda's evidence is outweighed by the evidence regarding Facenda's high level of recognition among NFL's target audience, the relatedness of Facenda's fame to Madden NFL 06, the identity of the likeness used by NFL, NFL's apparent intent in selecting Facenda, and the fact that The Making of Madden was shown only on the station where Facenda was likely to be the most recognizable. I conclude, therefore, that Facenda is entitled to recovery under the Lanham Act.

### D. *Plaintiff's Tort Cause of Action*

In his complaint, Facenda asserted a cause of action for invasion of privacy. This common law tort, as it stands in the Commonwealth of Pennsylvania, has no relevance to this action. *Smith v. Borough of Dunmore,* Civ. A. NO. 305–1343, 2007 WL 762930 at *8 (M.D.Pa. Mar. 7, 2007) ("The elements to be proven are (1) publicity, (2) given to private facts, (3) which would be highly offensive to a reasonable person and (4) which are not of legitimate concern to the public").

▮ To the extent that there was ever a common law cause of action for misappropriation of identity, it is clearly subsumed now by 42 Pa.C.S.A. § 8316. Facenda has not mentioned the common law cause of action in his submissions on the cross-

motions for summary judgment, and I feel certain he has reached the same conclusion as I do here. Nevertheless, for the sake of clarity, I will enter judgment on this cause of action in favor of NFL.

### ORDER

AND NOW, this 3rd day of May, 2007, upon consideration of Plaintiff's Motion for Summary Judgment on liability, filed in this action as Document No. 26, and Defendants' Motion for Summary Judgment on liability, filed as Document No. 30, and the responses to these motions, it is hereby ORDERED that Plaintiff's Motion is GRANTED IN PART AND DENIED IN PART, and that Defendant's Motion is GRANTED IN PART AND DENIED IN PART, as follows:

1. Plaintiff's Motion is GRANTED regarding the claims under 42 Pa.C.S.A. § 8316 and the Lanham Act. It is DENIED as to the claim for invasion of privacy.

2. Defendant's Motion is GRANTED as to the claim for invasion of privacy; it is otherwise DENIED.

3. JUDGMENT SHALL BE ENTERED in favor Plaintiff AS TO LIABILITY ONLY on the claims under 42 Pa. C.S.A. § 8316 and the Lanham Act. JUDGMENT SHALL BE ENTERED in favor of the Defendant on the claim for invasion of privacy.

4. Thirty days after the date of this Order, the Court will contact the parties to schedule a telephonic conference for setting discovery and trial dates for a trial on damages only.