

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2008

# Facenda v. NFL Films Inc

Precedential or Non-Precedential: Precedential

Docket No. 07-3269

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Facenda v. NFL Films Inc" (2008). *2008 Decisions.* Paper 449.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/449

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-3269

JOHN FACENDA, JR., Executor
of The Estate of John Facenda

v.

N.F.L. FILMS, INC.; THE NATIONAL FOOTBALL
LEAGUE;
N.F.L. PROPERTIES, LLC,

Appellants

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 06-cv-03128)
Magistrate Judge: Honorable Jacob P. Hart

Argued June 6, 2008

Before: AMBRO, CHAGARES and COWEN, Circuit Judges

(Opinion filed: September 9, 2008)

Bruce P. Keller, Esquire (Argued)
S. Zev Parnass, Esquire
Debevoise & Plimpton
919 Third Avenue
New York, NY   10022-0000

Robert N. Spinelli, Esquire
Catherine N. Jasons, Esquire
Kelley Jasons McGowan Spinelli & Hanna
50 South 16th Street
Two Liberty Place, Suite 1900
Philadelphia, PA 19102-0000

     Counsel for Appellants


Tracy P. Hunt, Esquire
110 North State Street
P.O. Box 99
Newtown, PA 18940-0000

Paul L. Lauricella, Esquire (Argued)
The Beasley Firm
1125 Walnut Street
Philadelphia, PA   19107-0000

     Counsel for Appellee

OPINION OF THE COURT

Table of Contents

I. Facts . . . . . . . . . . . . . . . . . . . . . . . 5
II. Procedural History. . . . . . . . . . . . . . . . 8
III. Jurisdiction . . . . . . . . . . . . . . . . . . . 8
VI. Standard of Review. . . . . . . . . . . . . . . . 9
V. False Endorsement Under the Lanham Act. . . . . . 11
    A. The Legal Standard for Likelihood of
        Confusion in False Endorsement Claim
        Brought Under § 43(a) of the Lanham Act. . 13
        1. First Amendment Limits on the
            Lanham Act. . . . . . . . . . . . . 14
        2. Tailoring the *Lapp* Factors to False
            Endorsement Claims. . . . . . . . . 22
        3. Distinguishing Between Subsections
            of Section 43(a)(1). . . . . . . . . . 28
    B. Application to the Estate's Claim. . . . . . 33
        1. The Standard Release Contract.. . . . 34
        2. Genuine Issues of Material
            Fact Remain. . . . . . . . . . . . 35
VI. Unauthorized Use of Name or Likeness Under
    Pennsylvania Law.. . . . . . . . . . . . . . . . . 40
    A. The NFL's Copyright in the Sound Clips. . . 42
    B. Express Preemption. . . . . . . . . . . . . 43
        1. Equivalent to an Exclusive Right?. . . 44
        2. Copyrightable Subject Matter?.. . . . 46

C.	Conflict Preemption. . . . . . . . . . . . . . 47
VII.	Conclusion. . . . . . . . . . . . . . . . . . . . 59

AMBRO, <u>Circuit Judge</u>

John Facenda, a Philadelphia broadcasting legend, provided his voice to many productions of NFL Films, Inc. before his death in 1984. These well-known productions recounted tales of the National Football League with filmed highlights, background music, and Facenda's commanding narration. More than two decades after Facenda's death, NFL Films used small portions of his voice-over work in a cable-television production about the football video game "Madden NFL 06." That production, entitled "The Making of Madden NFL 06," sparked this controversy.

Facenda's Estate ("the Estate") sued NFL Films, the National Football League, and NFL Properties (which we refer to collectively, where appropriate, as "the NFL") in the United States District Court for the Eastern District of Pennsylvania. The Estate claims that the program's use of Facenda's voice falsely suggested that Facenda endorsed the video game, violating the federal Lanham Act, which deals with trademarks and related theories of intellectual property. The Estate also claims that the program was an unauthorized use of Facenda's name or likeness in violation of Pennsylvania's "right of publicity" statute. In its defense the NFL argued, among other things, that its copyrights in the original NFL Films productions

4

that Facenda narrated gave it the exclusive right to use portions of those productions' soundtracks as it saw fit, including in the television piece at issue.

We must resolve this clash between parties claiming different types of intellectual property. Although we agree with much of the Court's trademark analysis, for the reasons that follow we vacate the Court's grant of summary judgment for the Estate and remand for trial on the Lanham Act claim. We affirm, however, the District Court's grant of summary judgment to the Estate on the Pennsylvania right-of-publicity claim.

## I. Facts

Facenda won national acclaim for his NFL Films work. His Estate credits that fame to the special qualities of his voice. In various depositions, several representatives for NFL Films described Facenda's deep baritone voice as "distinctive," "recognizable," "legendary," and as known by many football fans as "the Voice of God." As recently as 1999, NFL Films released works branded as featuring "the Legendary Voice of John Facenda."

For decades, Facenda worked on a session-by-session basis under an oral agreement, receiving a per-program fee. But shortly before he died from cancer in 1984, Facenda signed a "standard release" contract stating that NFL Films enjoys "the

unequivocal rights to use the audio and visual film sequences recorded of me, or any part of them . . . in perpetuity and by whatever media or manner NFL Films . . . sees fit, provided, however, such use does not constitute an endorsement of any product or service."

In 2005, NFL Films produced "The Making of Madden NFL 06" about the soon-to-be released annual update of the video game that simulates NFL games. This production is 22 minutes long and was shown on the NFL Network eight times in a three-day span leading up to the release of the video game to retail stores. It featured interviews with NFL players, the game's producers, and others. It also included several sequences comparing the video game's virtual environment with the actual NFL environment, extolling the realism of everything from the stadiums to the game play. The end of the program featured a countdown to the video game's release.

The District Court[1] found that not a single critical observation was made in this video regarding Madden NFL 06; all the commentary was positive. Other media, outside of the NFL Network, also covered the release of the game and addressed similar topics (albeit with the inclusion of the occasional criticism or recitation of the game's perceived faults).

---

[1] With the consent of the parties, Magistrate Judge Jacob P. Hart exercised jurisdiction as the District Court in this case pursuant to 28 U.S.C. § 636(c).

The program used sound recordings, taken from earlier NFL Films' productions, of three sentences read by Facenda: (1) "Pro Football, the game for the ear and the eye," (2) "This sport is more than spectacle, it is a game for all seasons," and (3) "X's and O's on the blackboard are translated into aggression on the field." These excerpts from his NFL Films work total 13 seconds of the program. In its opening brief to our Court, the NFL admits that these excerpts were chosen "to underscore the degree to which the video game authentically recreates the NFL experience."

The producers of the program used the excerpts in a slightly altered form. The sound waves in the original recording of Facenda's voice were digitally filtered to sound more like the synthesized speech one might hear from a computer. (NFL Films President Steve Sabol described the results of this aesthetic choice by the show's producers as "awful.")

The NFL has an agreement with EA Sports, the makers of Madden NFL 06, which provides the NFL with royalty revenue in return for the use of the NFL's intellectual property. Various e-mail messages in the record suggest that NFL Films sought to create the television program as a promotion for Madden NFL 06, describing it as the "Madden Promo" or as "the Advertisements" in actors' release forms. But in their depositions, many NFL Films executives testified that the program was a documentary and denied that it was a commercial or that it was motivated by promotional considerations.

7

## II. Procedural History

Facenda's Estate initially sued the NFL for false endorsement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for unauthorized use of name or likeness (known as the "right of publicity") under 42 Pa. Cons. Stat. Ann. § 8316.[2] The District Court split the case into a liability phase and a damages phase. After discovery in the liability phase, the parties cross-moved for summary judgment and agreed at a hearing that the District Court could resolve the liability issues on the evidence already before it. The District Court granted the Estate's motion for summary judgment on both the false-endorsement claim and the right-of-publicity claim. *Facenda v. NFL Films, Inc.*, 488 F. Supp. 2d 491, 514 (E.D. Pa. 2007).

## III. Jurisdiction

The District Court had jurisdiction under 15 U.S.C. § 1121 because of the Estate's Lanham Act claims. It exercised

---

[2] The Estate's complaint also included a claim for invasion of privacy under Pennsylvania common law. The Estate effectively abandoned this claim at the summary judgment stage, possibly because, as the District Court stated, Pennsylvania's right-of-publicity statute subsumed the common-law tort of invasion of privacy. The District Court entered summary judgment for the NFL on this claim and the Estate did not appeal.

supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

Because our Court has not yet issued an opinion interpreting the Lanham Act in the context of a false-endorsement claim, and because the District Court perceived a conflict between our caselaw (on the general interpretation of § 43(a)(1)(A) of the Lanham Act) and a single district-court case from the Eastern District of Pennsylvania (which dealt with the specific issue of false endorsement), the District Court certified the issue for interlocutory appeal. *Facenda v. NFL Films, Inc.*, No. 06-3128, 2007 WL 1575409, at *2–3 (E.D. Pa. May 24, 2007). It also certified whether copyright law preempts the Estate's state-law right-of-publicity claim because the caselaw (across all federal courts of appeals) does not reflect a "consistent line of reasoning." *Id.* at *3. We granted the petition for interlocutory appeal and have jurisdiction under 28 U.S.C. § 1292(b).

## IV. Standard of Review

We review the District Court's legal conclusions *de novo*, reading all facts in the light most favorable to the party that did not move for summary judgment—the Estate. *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311, 315 (3d Cir. 1999). The Estate argues that we review the District Court's "factual findings" under a "clearly erroneous" standard. But, to support this proposition, the Estate cites a case reviewing a

9

preliminary injunction. *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 226 (3d Cir. 1990). We recently explained the important distinction between the standards of review for a preliminary injunction and summary judgment. *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 (3d Cir. 2006).

"Failure to strictly observe the principles governing summary judgment becomes particularly significant in a trademark or tradename action, where summary judgments are the exception." *Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1062-63 (3d Cir. 1991). On a summary judgment motion, the District Court must not find facts. *See Doeblers'*, 442 F.3d at 820 ("A District Court should not weigh the evidence and determine the truth itself, but should instead determine whether there is a genuine issue for trial."). Rather, it should identify undisputed facts and resolve the remaining disputed facts in favor of the non-movant. For example, "[c]redibility determinations that underlie findings of fact are appropriate to a bench verdict," but "[t]hey are inappropriate to the legal conclusions necessary to a ruling on summary judgment." *Country Floors*, 930 F.2d at 1062. When considering the District Court's grant of summary judgment to the Estate on a particular claim, "the sole question before [our] Court is whether plaintiff met its burden of demonstrating that it was entitled to judgment as a matter of law." *Doeblers'*, 442 F.3d at 820.

## V. False Endorsement Under the Lanham Act

The Estate alleges that the use of sound samples of Facenda's voice in "The Making of Madden NFL 06" falsely implied that the Estate had agreed to endorse the video game that is the production's subject. This false endorsement, they argue, violates § 43(a)(1)(A) of the Lanham Act. This provision reads as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another

11

person, or as to the
origin, sponsorship,
or approval of his or
her goods, services,
o r c o m m e r c i a l
activities by another
person . . .

shall be liable in a civil action by
any person who believes that he or
she is or is likely to be damaged by
such act.

15 U.S.C. § 1125(a)(1).[3] To prove a violation of § 43(a)(1)(A) in a false endorsement case, a plaintiff must show that: (1) its mark is legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the plaintiff's sponsorship

---

[3] The phrase "another person" in § 43(a)(1)(A) indicates that "Congress selected language broad enough to encompass a claim by a deceased celebrity's [e]state or by any celebrity's assignee." *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1032 (C.D. Cal. 1998) (explaining that Princess Diana's estate had stated a cognizable claim for false endorsement under § 43(a)(1)(A) against a manufacturer of jewelry, commemorative plates, sculptures, and dolls featuring the Princess's likeness).

or approval of those goods or services.  *See Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000) (listing the three prongs of a § 43(a) claim).

The NFL does not deny that courts broadly interpret the terms "name, symbol, or device" in § 43(a)(1) to include other indicia of identity, such as a person's voice.  *See Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1106–07 (9th Cir. 1992) (holding that § 43(a) claims based on voice are cognizable).  Nor does the NFL deny that Facenda's voice is distinctive and generally protectable as an unregistered mark.  Thus, the Estate has satisfied the first prong of a § 43(a) claim.  The NFL also declines to contest the second prong—that the mark is owned by the Estate.

Our case thus focuses on the third prong: whether the NFL's use of Facenda's voice was "likely to cause confusion" among consumers by suggesting that Facenda's Estate has an "affiliation, connection, or association" with EA Sports's video game implying that the Estate "sponsor[s]" or "approve[s] of" that product.  15 U.S.C. § 1125(a)(1)(A).

**A.  The Legal Standard for Likelihood of Confusion in False Endorsement Claims Brought Under § 43(a) of the Lanham Act**

The NFL contends that the District Court applied the wrong legal standard under § 43(a)(1) to the Estate's false-

13

endorsement claim. It also argues that our Constitution's First Amendment right to free speech prohibited application of the Lanham Act to its television production in this case. Because the NFL's First Amendment defense presents a threshold issue that would affect how we apply trademark law in this case, we address that argument first. Ultimately rejecting the First Amendment defense, we outline the multi-factor test courts use to evaluate the likelihood of consumer confusion when faced with a false-endorsement claim under § 43(a)(1)(A). Finally, we respond to the NFL's various disagreements with the District Court's analysis. The NFL's primary argument is that the legal standards under § 43(a)(1)(A) and § 43(a)(1)(B)[4] do not differ from each other, which implies that the Estate was required to bring evidence of actual confusion to prove a likelihood of confusion. We reject that argument and thus adopt a trademark analysis similar to the District Court's.

### 1. First Amendment Limits on the Lanham Act

The NFL argues that its production constitutes informational expression, artistic expression, or both, and is thus protected by the First Amendment. It asks our Court to adopt

---

[4] Subsection 43(a)(1)(B) prohibits the use of another person's mark that, "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).

the balancing test of the Second Circuit Court of Appeals'
decision in *Rogers v. Grimaldi*, which weighs "the public
interest in avoiding consumer confusion" against "the public
interest in free expression." 875 F.2d 994, 999 (2d Cir. 1989).
In that case, the dancer and actress Ginger Rogers sued the
producers and distributors of "Ginger and Fred," a film about a
pair of Italian dancers nicknamed for Rogers and Fred Astaire.
The court rejected Rogers's false-endorsement claim. Under the
*Rogers* test, the proper balance between trademark law and free
expression "will normally not support application of the
[Lanham] Act unless the title [1] has no artistic relevance to the
underlying work whatsoever, or . . . [2] the title explicitly
misleads as to the source or the content of the work." *Id*.
Because the film's title (1) had an "ironic" and "ambiguous"
meaning related to its subject, *id*. at 1001, and (2) did not
directly state that it depicted Rogers, free-speech concerns
outweighed survey evidence that "some members of the public
would draw the incorrect inference that Rogers had some
involvement with the film," *id*.

The analysis of *Rogers* has been adopted by three other
Courts of Appeals. *See Parks v. LaFace Records*, 329 F.3d 437,
451–52 (6th Cir. 2003) (applying *Rogers* to a song title); *Mattel,
Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002)
(same); *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 & n.7
(5th Cir. 1999) (adopting *Rogers* in a case concerning a book
title). Soon after announcing the *Rogers* test, the Second Circuit
stated that the test is "generally applicable to Lanham Act claims

15

against works of artistic expression, a category that includes parody." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group,* 886 F.2d 490, 495 (2d Cir. 1989) (applying *Rogers* to a parody book cover). But we have identified only one federal appellate case other than *Cliffs Notes* that applies the *Rogers* test to something other than the title of a creative work. *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 936–37 (6th Cir. 2003) (applying *Rogers* to a commemorative sports painting of Tiger Woods's victory at the Masters golf tournament in 1997). *But see id.* at 943–49 (Clay, J., dissenting) (declining to endorse the application of *Rogers* in that case and arguing that the majority had applied *Rogers* in a faulty fashion).

The NFL asks us also to adopt *Rogers* and apply it to the use of "The Making of Madden NFL 06." Before considering whether either prong of the *Rogers* test applies, however, we must decide whether the television production is a "work[] of artistic expression," *Cliffs Notes*, 886 F.2d at 495, as understood in the context of construing the Lanham Act narrowly to avoid a conflict with the First Amendment, *see Rogers*, 875 F.2d at 998. Although the District Court did not address the NFL's First Amendment defense in its opinion,[5] the categorization of

---

[5] Nor did it certify the First Amendment question for interlocutory appeal. We may, however, address any issue implicit in the District Court's order granting summary judgment to the Estate on liability. *See NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 196 (3d Cir. 2006).

speech is a question of law that we must resolve through independent review of the program. *See Connick v. Myers*, 461 U.S. 138, 148 n.7, 150 n.10 (1983) ("[W]e are compelled to examine for ourselves the statements in issue and the circumstances under which they are made to see whether . . . they . . . are of a character which the principles of the First Amendment . . . protect. " (quotation marks omitted)).

The NFL posits that its program, taken as a whole, is a work of artistic expression, and that the producers' use of the particular sound clips at issue in this case represented an artistic choice. In the NFL's view, the strong association between Facenda's voice and the NFL means that the use of his voice conveyed the message that Madden NFL 06 provides an accurate rendering of NFL game play. By applying digital sound effects to make the voice sound computerized and adding a metallic echo, the program's producers aimed to connect the NFL's history (symbolized by Facenda's voice, which narrated much of that history) to a modern video game (symbolized by digital filtering of the voice). The NFL contends that it had the right to choose how to convey those messages, even if it meant using portions of recordings of Facenda's voice.

The NFL argues additionally that its program cannot be mere commercial speech—which is defined as "speech that does no more than propose a commercial transaction," *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001), and is not as protected as artistic expression, *id.*—because it contains

17

information that also appeared in news accounts of the release of Madden NFL 06. This informational material includes descriptions of the video game's realism, explanations of the game's features, and reports of gamers' and NFL players' enthusiasm for the new version. In this sense, the NFL argues, its program functions as a documentary explaining how the video game was made and depicting the phenomenon of the game's popularity.

The NFL also argues that, even if the program has promotional aspects (a point which it concedes only for the sake of argument), they are "inextricably intertwined" with the artistic and informational elements, meaning that we must treat the program as "fully protected speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796, 798 (1988) (applying "exacting First Amendment scrutiny" to a state regulation of charitable solicitation materials); *see In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 793 (3d Cir. 1999) (stating that *Riley* applies where "speech consists of 'complex mixtures of commercial and noncommercial elements'" (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 81 (1983) (Stevens, J., concurring))).

The Estate contends that the program is commercial speech, and we agree. Our Court has "three factors to consider in deciding whether speech is commercial: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation

18

for the speech." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990) (citing *Bolger*, 463 U.S. at 66–67). "An affirmative answer to all three questions provides 'strong support' for the conclusion that the speech is commercial." *Id.* (quoting *Bolger*, 463 U.S. at 67). This inquiry involves making "a ' "commonsense distinction between speech proposing a commercial transaction . . . and other varieties of speech." ' " *Orthopedic Bone Screw*, 193 F.3d at 792 (quoting *Bolger*, 463 U.S. at 65 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978))).

The first factor presents a novel issue, because the program is not a traditional 30- or 60-second television advertisement. But ultimately the question is not close. The Estate's comparison of the program to a late-night, half-hour-long "infomercial" is apt. Like an infomercial, the program focuses on one product, explaining both how it works and the source of its innovations, all in a positive tone.[6] While it does not

---

[6] Jon Albert Levy, an expert witness for the Estate, described the program as "not quite an infomercial" because "[t]here's no 800 number on it. There's not a call to action on it." He therefore described the program as a "documercial," apparently meaning that it had characteristics of a documentary in addition to characteristics of a traditional television advertisement. Yet those observations do not contradict his conclusion that the program is "a hundred percent promotional." The production uses informational and documentary techniques for the purpose

19

advertise the game's price, the program did feature a clock at its ending that displayed the number of days until the video game's release for sale. Furthermore, the program was only broadcast eight times in a three-day span immediately before the release of the video game to retail stores—much like an advertisement for an upcoming film. The second factor is easily satisfied because the program's sole subject is Madden NFL 06. The show does not refer to other video games—excepting previous years' versions of "Madden," which the program portrays as antiquated. The third factor is satisfied by NFL's licensing agreement with EA Sports, which gives the NFL a direct financial interest in sales of the video game.[7] Moreover, the video game's general promotion of NFL-branded football provides an additional indirect financial motivation. In this context, we deem "The Making of Madden NFL 06" to be commercial speech.

Although we err on the side of fully protecting speech when confronted with works near the line dividing commercial and noncommercial speech, we do not view "The Making of

of promoting the video game, and thus proposes a commercial transaction.

[7] The exact amount of royalties that EA Sports paid to the NFL in consideration for the exclusive right to use NFL trademarks and marketing support was redacted from the record. But NFL licensing manager Timothy Langley testified that "the more copies [of Madden NFL 06] that are sold, the more money we would make."

20

Madden NFL 06" as close to that boundary. Unlike the film title in *Rogers*, the books in *Cliffs Notes*, or the painting in *ETW*, the work accused of trademark infringement in our case aims to promote another creative work, the video game. Even if *Rogers* should apply beyond titles (an extension undertaken, to our knowledge, in only the two cases mentioned above), we decline to apply it here in a context with that additional degree of separation. Moreover, the artistic and informational messages that the NFL contends the program conveys amount to mere praise for the product, attesting to its realism and popularity. As the District Court noted, "no one in The Making of Madden had a negative thing to say about the game," 488 F. Supp. 2d at 500, unlike news accounts that mentioned various criticisms. This belies any argument that the program has a documentary purpose.

Because we hold that "The Making of Madden NFL 06" is commercial speech rather than artistic expression, we need not reach the issue whether our Court will adopt the *Rogers* test. We acknowledge that commercial speech does receive some First Amendment protection. *See, e.g., United Foods, Inc.*, 533 U.S. at 409; *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). Yet the Lanham Act customarily avoids violating the First Amendment, in part by enforcing a trademark only when consumers are likely to be misled or confused by the alleged infringer's use. *See id.* at 563 ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."); *see also* 6 J. Thomas McCarthy,

21

McCarthy on Trademarks and Unfair Competition § 31:142, at 31-229 (4th ed. 1996 & Supp. 2008) (describing the low level of First Amendment protection for misleading speech); Alex Kozinski, *Trademarks Unplugged*, 68 N.Y.U. L. Rev. 960, 973 (1993) ("So long as trademark law limits itself to its traditional role of avoiding confusion in the marketplace, there's little likelihood that free expression will be hindered."). Thus, we reject the NFL's First Amendment defense and proceed to analyze the Estate's false-endorsement claim under trademark law without overlaying the balancing test of *Rogers*.

**2. Tailoring the *Lapp* Factors to False Endorsement Claims**

The Estate claims that the NFL violated § 43(a)(1)(A) of the Lanham Act by falsely implying that Facenda (or, as here, his successor in interest) had endorsed Madden NFL 06. This claim is considered a trademark claim because Facenda's voice is a distinctive mark, the Estate owns the mark, and "The Making of Madden NFL 06" allegedly creates a likelihood of confusion that Facenda's Estate has an "affiliation, connection, or association" with the Madden NFL 06 video game implying that the Estate "sponsor[s]" or "approve[s] of" that game. 15 U.S.C. § 1125(a)(1)(A).

Section 43(a)(1)(A) covers more than just false endorsement claims. In fact, false endorsement claims are rare enough that our Court has not previously announced the legal

22

standard that applies to them. A more typical claim under § 43(a)(1)(A) involves one company accusing another company of using the first company's unregistered mark. We therefore must determine whether the District Court analyzed the Estate's Lanham Act claim under a standard suitably tailored to the false endorsement context.

Our Court evaluates § 43(a)(1)(A) claims under the ten-factor test outlined in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983) (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978), *abrogated on other grounds by Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982). We subsequently adapted *Lapp* slightly to accommodate cases involving either directly competing or non-competing goods. Applying *Lapp*, we consider the following ten factors:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;

> (2) the strength of the owner's mark;

> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

23

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; [and]

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner

> to manufacture a product in the
> defendant's market, or expect that
> the prior owner is likely to expand
> into the defendant's market.

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir. 2000).

The *Lapp* factors allow courts to compare the marks of two competing or non-competing goods. But this makes *Lapp* an uncomfortable fit in a false-endorsement case like this one. This case presents the question whether the NFL used the Estate's mark (*i.e.*, Facenda's voice) in a way that falsely implied that the Estate endorsed a video game. Rather than protecting its mark with respect to a particular product, the Estate seeks to reserve the exclusive right to grant or deny permission to those who wish to use Facenda's voice to promote unspecified products in the future.

To address this disconnect between *Lapp* and false-endorsement claims, the District Court concluded that under § 43(a)(1)(A) the traditional *Lapp* factors apply in a modified form specifically crafted for false-endorsement cases by the Ninth Circuit Court of Appeals:

> 1. the level of recognition that the
> plaintiff has among the segment of
> the society for whom the

25

defendant's product is intended;

2. the relatedness of the fame or success of the plaintiff to the defendant's product;

3. the similarity of the likeness used by the defendant to the actual plaintiff;

4. evidence of actual confusion;

5. marketing channels used;

6. likely degree of purchaser care;

7. defendant's intent [in] selecting the plaintiff; and

8. likelihood of expansion of the product lines.

Although these are all factors that are appropriate for consideration in determining the likelihood of confusion, they are not necessarily of equal importance, nor do they necessarily apply to every case.

26

*Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007–08 (9th Cir. 2001).

The District Court reasoned that each of the *Downing* factors corresponds to one or more of the *Lapp* factors. *Facenda*, 488 F. Supp. 2d at 510 n.6. The Court linked *Downing* factor 1 to *Lapp* factors 2 and 8, *Downing* factor 2 to *Lapp* factor 9, *Downing* factor 3 to *Lapp* factor 1, *Downing* factor 4 to *Lapp* factor 6 (a nearly exact correspondence), *Downing* factor 7 to *Lapp* factor 5 (also an especially close correspondence), and *Downing* factor 8 to *Lapp* factor 10. *Id.* The only *Lapp* factor left unmatched is the fourth, which we address below.

We substantially agree with the District Court's approach to tailoring the *Lapp* factors in the manner of *Downing*. We augment the list set out above by noting that *Downing* factor 5 is analogous to *Lapp* factor 7, and that *Downing* factor 6 relates to *Lapp* factor 3. Also, we modify the fourth factor of *Downing* by adding the words "and the length of time the defendant employed the allegedly infringing work before any evidence of actual confusion arose." This accounts for the fourth *Lapp* factor, which has no corresponding factor in *Downing*. Otherwise, we hold that the *Downing* factors retain the substance of *Lapp* while appropriately tailoring the language to false endorsement claims. *Cf. Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 224–26 (3d Cir. 2005) (tailoring the *Lapp* factors for "nominative use" cases, in which the alleged infringer refers to a competitor's product in discussing its own product); *A & H*

27

*Sportswear*, 237 F.3d at 207 ("Although all of the factors can be useful, the Lanham Act does not require that [the *Lapp* factors] be followed precisely so long as the relevant comparisons suggested by the test are made.").

In adopting our slightly modified version of *Downing*, affirming the District Court's approach in large part, we emphasize that this formulation of the *Lapp* factors applies only to false endorsement claims. This holding—seeking only to uphold the substance of *Lapp* as the set of factors for courts to consider when evaluating likelihood of confusion—does not critique any of our Court's prior precedent in the area of trademark infringement.

### 3. Distinguishing Between Subsections of Section 43(a)(1)

Under the slightly modified *Downing* test, evidence of actual confusion among consumers about whether Facenda's Estate had agreed to endorse Madden NFL 06 is one factor to consider among eight. A common way of providing such evidence of actual confusion is to conduct a survey, but the Estate did not conduct one. The District Court held that the lack of survey evidence (or even anecdotal evidence of actual confusion) was "not fatal." *Facenda*, 488 F. Supp. 2d at 512. Even though the actual-confusion factor can be important, survey evidence is expensive and difficult to obtain, leading some courts not to penalize plaintiffs for failing to obtain it. *Id.* at 512–13.

28

Moreover, evidence of actual confusion was especially difficult to obtain in this case because the program aired on NFL Network (a cable network, we note, to which many households do not have access) only eight times. *See id.* at 513. Weighing all the *Downing* factors, the District Court held that a likelihood of confusion did exist about whether Facenda's Estate agreed to endorse Madden NFL 06. *Id.*

The NFL strenuously objects to the District Court's choice of legal standard under § 43(a)(1)(A) as well as its legal conclusion about whether evidence of actual confusion was required. It argues that subsections (a)(1)(A) and (a)(1)(B) have the same standard, which distinguishes impliedly false endorsements from expressly false endorsements. It also contends that claims of impliedly false endorsement like the Estate's—as opposed to, for example, an expressly false endorsement consisting of sound clips of Facenda's voice digitally stitched together to say "I think you should buy Madden NFL 06"—must be proven with evidence that the program actually confused consumers. At the very least, the NFL argues, the District Court should have required evidence that consumers actually received the implied message. (The NFL distinguishes receipt of a false message from belief in that falsehood.)

We reject the NFL's arguments about the proper legal standard. The *Lapp* factors apply, modified for false endorsement cases as described above, and no single factor is dispositive. Our Court has made the difference in the standards

under (a)(1)(A) and (a)(1)(B) explicit:

> Some actions brought under the Lanham Act require proof of actual confusion and others do not. In an action brought under sections 32 and 43(a) of the Lanham Act for trademark infringement, 15 U.S.C. §§ 1114(1) and 1125(a)(1)(A), plaintiff need not provide proof of actual confusion; he need only show likelihood of confusion. In an action brought under another part of section 43(a) of the Lanham Act for false advertising, 15 U.S.C. § 1125(a)(1)(B), plaintiff need not prove the challenged advertising misled the public if he can show it was literally false. However, if his claim is not that the advertising was false but that it was misleading, he must prove the public was actually misled or confused by it.

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 n.8 (3d Cir. 1994) (citations omitted). For claims brought under subsection (a)(1)(A), only a likelihood of confusion is required. The distinction between impliedly false and expressly false

statements that the NFL urges us to apply comes from the jurisprudence under subsection (a)(1)(B). We decline the NFL's invitation to muddle the two separate bodies of law that have developed under the separate subsections of § 43(a).

The statutory text of the two subsections differs; only subsection (a)(1)(A) includes the phrase "likely to cause confusion." 15 U.S.C. § 1125(a)(1)(A); *see Facenda*, 488 F. Supp. 2d at 507–08. The case law also differs; our Court has long applied the *Lapp* factors in (a)(1)(A) cases but not in (a)(1)(B) cases. *See Facenda*, 488 F. Supp. 2d at 508–09. The leading treatise on trademark law explains that plaintiffs *could* bring false endorsement claims under either (a)(1)(A) or (a)(1)(B). 5 McCarthy on Trademarks § 28.15, at 28-20 ("Both prongs of the post-1989 version of § 43(a) would seem to be implicated in false endorsement cases."). But that does not mean that plaintiffs *must* bring claims under both subsections. Nor does it mean that the elements of (a)(1)(A) claims and (a)(1)(B) claims are the same, as the NFL alleges. In fact, (a)(1)(A) requires only a likelihood of confusion whereas claims of impliedly false statements under (a)(1)(B) require showing actual confusion or misleading statements.

The NFL cites a number of cases for the proposition that we must require evidence of actual confusion by (or, at a minimum, actual receipt of) the false-endorsement message. All but one of these cases were decided under subsection (a)(1)(B), the false advertising prong of § 43(a). *See Novartis Consumer*

31

*Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (quoting § 43(a)(1)(B) and describing the legal standard for false advertising claims); *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 91–92 (3d Cir. 2000) (same); *Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129 & n.6 (3d Cir. 1994) (same); *Sandoz*, 902 F.2d at 227 (quoting only § 43(a), not specifying which subsection, but describing the § 43(a) claim as one for false advertising); *U.S. Healthcare*, 898 F.2d at 921–23 (quoting § 43(a) and both subsections' predecessors but citing and discussing false-advertising cases).

Only a single opinion from a district court both cites subsection (a)(1)(A) and requires evidence of actual confusion. *Seale v. Gramercy Pictures*, 964 F. Supp. 918 (E.D. Pa. 1997). That case analyzed a false endorsement claim under subsection (a)(1)(B), the false advertising prong of § 43(a)(1). Yet, when quoting the statutory language at the outset of its analysis, the Court quoted the language of subsection (a)(1)(A) but stated immediately thereafter the standard for "[a] claim for *false advertising* under the Lanham Act." *Id.* at 930 (emphasis added). As we read that case, the District Court in *Seale* erred (likely inadvertently) by quoting the language of subsection (a)(1)(A) rather than (a)(1)(B) as it apparently intended. But that small passage in *Seale* forced the District Court here to resolve the apparent conflict between *Seale* and our Court's precedent, including *Fisons*. It reviewed several cases in both the (a)(1)(A)

32

line and the (a)(1)(B) line before deciding, correctly, that *Fisons* was the correct statement of the law. *Facenda*, 488 F. Supp. 2d at 505–10. The oversight in *Seale* also led the NFL to spend much of its opening brief to our Court attempting to blur the distinction between (a)(1)(A) and (a)(1)(B).

We thus reject the NFL's challenge to the legal standard applied by the District Court. We adhere to the language in *Fisons* summarizing the difference between the subsections and view the contrary language in *Seale*,[8] which regardless is not binding on our Court, as an oversight in a case that otherwise dealt with false advertising.

**B. Application to the Estate's Claim**

With the legal standard under § 43(a)(1)(A) settled, we turn to the application of that standard to the facts of the Estate's claim. First, we briefly explain the limited significance of the standard release contract between Facenda and NFL Films, signed shortly before his death. Second, we evaluate whether summary judgment for the Estate on its Lanham-Act false-endorsement claim was appropriate.

---

[8] But as noted below (*infra* Section VI.C) an earlier decision in the *Seale* case, 949 F. Supp. 331 (E.D. Pa. 1996), proves especially useful in another context in sparking a framework for analyzing whether federal copyright law preempts a state-based right-of-publicity claim.

### 1. The Standard Release Contract

A threshold inquiry is whether the "standard release" contract that Facenda signed serves as a "complete defense" to the Estate's claims, as the NFL argued in the District Court. The contract states that the NFL can use its recordings featuring Facenda's voice as it sees fit, "provided, however, such use does not constitute an endorsement of any product or service." The District Court rejected the NFL's defense. It concluded that "The Making of Madden NFL 06" is "commercial in nature"—*i.e.*, that it constitutes an endorsement of the video game—and does not fall within the terms of the contract. *Id.* at 501.[9]

In interpreting the language of the contract, we would not focus on whether the program *as a whole* constitutes an endorsement. Instead, we would ask whether *the use of Facenda's voice within the program* constitutes an endorsement. Viewed in this light, the District Court's rationale does not support rejecting the defense. Yet we agree with the Court's

---

[9] On appeal, the NFL does not emphasize its argument that the release provides a defense. But it continues to dispute the District Court's characterization of the production as commercial in its briefing to our Court. Because the District Court relied on that characterization to reject the defense, we deem the NFL not to have waived this defense. This does not prejudice the Estate, because nothing turns on the standard release contract, as we explain in this Section.

34

conclusion that the contract does not bar the Estate's false-endorsement claim.

In the contract, Facenda waived his rights with regard to any uses that were not endorsements. But if the Estate succeeds in proving the elements of its false-endorsement claim, such a finding by the District Court will demonstrate that the NFL's use of Facenda's voice was an endorsement, falling outside the contract's waiver clause. On the other hand, if the Estate's false-endorsement claim were to fail, meaning that the use was not an endorsement, the contract's waiver would apply to that claim. Thus, what falls inside the Lanham Act's prohibitions defines what is outside the contract's waiver. This renders further analysis of the contract as an independent defense moot. The significance of the contract is that Facenda did not waive the right to bring a claim under the Lanham Act for false endorsement.

## 2. Genuine Issues of Material Fact Remain

Applying the eight *Downing* factors, the District Court concluded that six factors favored the Estate, while only one factor, evidence of actual confusion, favored the NFL. 488 F. Supp. 2d at 510–513. (It held that the sixth factor, likely degree of purchaser care, did not apply. *Id.* at 513.) On balance, the Court concluded that "The Making of Madden NFL 06" was likely to confuse consumers as to whether the Estate sponsored or approved of the video game. *Id.* Although the NFL barely

addressed the issue in its briefing to our Court, under our *de novo* standard of review on a grant of summary judgment, we must examine whether the District Court properly awarded summary judgment to the Estate.

The parties told the District Court that no more evidence was necessary to decide their cross-motions for summary judgment. *Id.* at 499 ("[B]oth parties agreed that they had no need of further discovery, and that the Court could resolve all the liability issues on the evidence already before it."). But "the mere fact that both parties seek summary judgment does not constitute a waiver of a full trial or the right to have the case presented to a jury." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998), at 330–31 (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). Although it might seem to serve principles of judicial economy, parties may not stipulate to forgoing a trial when genuine issues of material fact remain that prevent either side from succeeding on a motion for summary judgment.

Genuine disputes over material facts do exist in our case. For example, the NFL denies that it had the intent to profit unjustly from its use of Facenda's voice in the program. NFL Films executives testified in depositions, for instance, that they thought they had the right to use the sound clips they did—as long as the program was not a commercial. *See Facenda*, 488 F. Supp. 2d at 499. The NFL Films producers did not see the

production as a violation of the standard release contract because of how they perceived its documentary-like aspects. Although we concluded in Section V.A.1 above that the program is commercial speech for First Amendment purposes, that legal conclusion does not dictate the result of a factual inquiry into the NFL's intent.

The District Court appears to have disbelieved the NFL Films executives' testimony regarding intent. A dim view of deposition testimony that contradicts internal e-mails (that testimony including statements like "The whole show is a 'making of' show[,] so all it does it promotes [M]adden," *id.* at 497) may have ample justification. But the NFL has a plausible point that the District Court was rejecting contrary evidence and making a credibility judgment, which is disallowed when ruling on a summary judgment motion. *See Country Floors*, 930 F.2d at 1062; *cf.* 10B Wright, Miller & Kane, Federal Practice and Procedure § 2730 (suggesting that summary judgment is often inappropriate when a state of mind, such as intent or knowledge, is an element of a claim).

Another issue of disputed fact is whether any consumers actually received the message that Facenda endorsed Madden NFL 06. This falls under the fourth factor of *Downing*, evidence of actual confusion. The Estate introduced no consumer survey evidence and no anecdotal evidence. *Facenda*, 488 F. Supp. 2d at 498. But the Estate did produce an expert witness on the issue of consumer confusion—Jon Albert Levy, who "testified that

37

viewers would 'probably' believe, mistakenly, that there was an affiliation between Mr. Facenda and the Madden game." *Id.* Levy's expertise centers on providing celebrities and music to appear in advertisements and pricing those appearances. Although he admitted having no experience with consumer surveys, he also testified that he must judge whether an appearance requires permission to determine the price owed to the celebrity or musical artist (*i.e.*, whether that price should be greater than zero). The District Court stated that this *Downing* factor overwhelmingly favored the NFL. *Id.* at 512. But that conclusion was the result of weighing competing evidence, which the summary judgment standard forbids.

The larger question here is whether the overall weighing of the *Downing* factors is a question of law or one of fact. "The Lanham Act's 'likelihood of confusion' standard is predominantly factual in nature. Thus, summary judgment is inappropriate when a jury could reasonably conclude that there is a likelihood of confusion." *Downing*, 265 F.3d at 1008 (internal citation omitted). The presence of genuine disputes over some of the *Downing* factors suggests that this fact-intensive inquiry should have been handled at trial.

We follow *Downing* in holding that likelihood of confusion is a question of fact. *See, e.g.*, *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 191, 194 (3d Cir. 1999); *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992). Thus, we vacate the District Court's grant of

38

summary judgment for the Estate and remand this issue for trial. On remand, the District Court should apply *Downing* (adding the fourth *Lapp* factor to its consideration of the fourth *Downing* factor as described above, *see* Section V.A.2 *supra*) to determine whether the NFL's program was likely to cause confusion among consumers regarding the Estate's sponsorship or approval of Madden NFL 06.[10]

_____

[10] We note here that while the District Court was correct in applying the *Downing* factors to the Estate's Lanham Act claim, it applied two of those factors—the fifth and eighth—in a manner that it is inconsistent with how those factors have been applied in prior cases.

First, the Court stated that the fifth factor, marketing channels used, favors the Estate because the program appeared on the NFL Network, the channel "most likely to attract viewers who would recognize John Facenda's voice as being associated with football." *Facenda*, 488 F. Supp. 2d at 512. Yet the usual fifth-factor analysis does not ask about audience recognition (which is the domain of the first *Downing* factor—level of recognition in the targeted market segment), inquiring instead about whether the defendant used marketing channels in which the plaintiff's endorsements are likely to appear. *See White v. Samsung Elecs. Am., Inc.,* 971 F.2d 1395, 1400 (9th Cir. 1992) (focusing on the extent to which products the plaintiff actually endorsed were marketed through the same channels and media in which the defendant's alleged unauthorized use of the plaintiff's likeness occurred).

Second, the eighth *Downing* factor, expansion of product

## VI. Unauthorized Use of Name or Likeness Under Pennsylvania Law

Pennsylvania law grants individuals the exclusive right to their name and likeness, which includes voice. 42 Pa. Cons. Stat. Ann. § 8316. "Any natural person whose name or likeness has commercial value and is used for any commercial or advertising purpose" without consent may sue for an injunction and damages. *Id*. § 8316(a). A deceased person's estate may bring such an action, *id*. § 8316(b)(3), although the right only lasts until thirty years after the person's death, *id*. § 8316(c).

The District Court held that the NFL violated this statute

lines, does not focus on future opportunities for the defendant to use the plaintiff's image, as the District Court implied. *See Facenda*, 488 F. Supp. 2d at 512 (the eighth *Downing* factor favors Facenda because the NFL's ongoing marketing agreement with EA Sports means "the question of NFL's right to use Facenda's recordings is likely to arise in the future"). Rather, the eighth factor concerns whether (a) the plaintiff plans to endorse a product that competes with a defendant's existing product or (b) the defendant plans to launch a new product that competes with a product the plaintiff already endorses. *See Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) (applying the eighth *Downing* factor to consider the potential that the plaintiff may in the future endorse goods similar to those defendant had been marketing using plaintiff's likeness).

with its use of Facenda's voice because (a) his voice's commercial value was not disputed, (b) the NFL used his voice for a commercial purpose, and (c) the standard release Facenda signed did not consent to the use of his voice in endorsements. *Facenda*, 488 F. Supp. 2d at 502. The NFL argued that its use of Facenda's voice was merely "incidental." *See* 2 J. Thomas McCarthy, The Rights of Publicity and Privacy § 7:20, at 42 (2d ed. 2000 & Supp. 2008). The District Court rejected this defense because the NFL stated a specific purpose for using the three sound clips of Facenda's voice: "enhanc[ing] the parallel between Madden NFL [06] and NFL football." *Facenda*, 488 F. Supp. 2d at 503. The NFL does not pursue its incidental-or-fleeting-use defense on appeal and we thus deem that argument to be waived.

We agree that the NFL has violated § 8316 on its face for precisely the reasons provided by the District Court, and we see no disputed issues of material fact on that question. On appeal, the NFL instead focuses on another argument it raised in the District Court—that copyright law preempts the Estate's right-of-publicity claim.[11]

---

[11] The NFL did not raise a First Amendment defense to the Estate's right-of-publicity claim, thereby waiving that defense. Thus, we need not engage in a First Amendment analysis with respect to this claim, though we note that freedom of expression issues arise in the right-of-publicity context analogous to those discussed above. *See supra* Section V.A.1.

41

**A. The NFL's Copyright in the Sound Clips**

A threshold issue for the NFL's preemption defense is whether the NFL has a valid copyright in the sound recordings of Facenda's voice. The NFL notes that it excerpted the sound clips at issue from copyrighted productions of NFL Films. Moreover, the sound clips represent Facenda's readings of copyrighted NFL scripts, making the clips "derivative works" (of the scripts) in which a distinct copyright exists. *See* 17 U.S.C. § 106(2) (granting copyright holders the exclusive right to prepare derivative works); *id*. § 102(a)(7) (allowing copyrights in sound recordings, which are separate and distinct from the copyrights in musical compositions of § 102(a)(2)). Either way, the NFL had the copyright in the sound clips.

By using the sound clips of Facenda's voice in "The Making of Madden NFL 06," the NFL was exercising its exclusive right to make derivative works of those sound clips under § 106(2). In effect, it was "sampling" itself, making a collage, taking a small piece of an old work and using it in a new work—as when a hip-hop group samples the drum part from James Brown's "Funky Drummer." It is well-established that copyrights extend to samples, even brief samples. *See, e.g., Grand Upright Music Ltd. v. Warner Bros. Records, Inc.*, 780 F. Supp. 182, 183 (S.D.N.Y. 1991). For instance, no third party to this case may use those recordings unless a limitation on or exception to the NFL's § 106 rights applies, such as the fair use doctrine of 17 U.S.C. § 107. *See Campbell v. Acuff-Rose Music,*

42

*Inc.*, 510 U.S. 569, 571–72, 579–80 (1994) (holding a parody of Roy Orbison's "Oh, Pretty Woman" may be a fair use). Thus, the NFL is correct that copyright law, taken in isolation, gives it the exclusive right (absent a limitation or exception) to use the sound recordings of Facenda's voice in the way that it did.

The question for us is how the NFL's (federal) copyright relates to Facenda's (state-law) right of publicity. Does the state-law right of publicity exist irrespective of the federal copyright? Put another way, does federal copyright law preempt the right of publicity claim under Pennsylvania law?

## B.  Express Preemption

The Copyright Code has an express preemption provision, which provides that

> all legal or equitable rights that [1] are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in [2] works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title.

43

17 U.S.C. § 301(a). In other words, for a state-law claim to be preempted by copyright law, it must protect (1) an exclusive right in (2) a work within copyright's subject matter. The same section of the Copyright Code goes on to explain that this provision is not meant to "annul[] or limit[]" any rights in works outside the subject matter of copyright under state law. *Id.* § 301(b)(1). Nor does it limit any intellectual property rights from other federal statutes, which is why there is no question of preemption regarding the Estate's Lanham Act claim. *See id.* § 301(d).

## 1. Equivalent to an Exclusive Right?

The Estate's claim seeks to block the NFL from exercising its exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, perform, and make derivative works from sound recordings in which it owns the copyrights. In that sense, it could be thought "equivalent" to a copyright holder's exclusive rights. 17 U.S.C. § 301(a), (b)(3); *cf. Harper & Row, Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985) ("If there is a qualitative difference between the asserted right [a claim for tortious interference with contract] and the exclusive right under the Act of preparing derivative works based on the copyrighted work, we are unable to discern it. In both cases, it is the act of unauthorized publication which causes the violation.").

Under the first prong of express copyright preemption

44

analysis, some courts have looked to the elements of a state-law cause of action. The presence of an "additional element" required to state a cause of action under state law, beyond what a copyright-infringement claim would require, renders the state-law cause of action not equivalent to a copyright. *See Dielsi v. Falk*, 916 F. Supp. 985, 991–93 (C.D. Cal. 1996).

Pennsylvania's right-of-publicity statute requires a showing of commercial value, defined as a "[v]aluable interest in a natural person's name or likeness that is developed through the investment of time, effort and money." 42 Pa. Cons. Stat. Ann. § 8316(e). The requirement under the statute that Facenda's voice have "commercial value," *id.* § 8316(a), provides an additional element beyond what a copyright-infringement claim requires, s*ee* 1 Nimmer on Copyright § 1.01[B][1][c], at 1-29 to -30 ("Invasion of privacy may sometimes occur by acts of reproduction, distribution, performance, or display, but inasmuch as the essence of the tort does not lie in such acts, pre-emption should not apply. The same may be said of the right of publicity."); *accord* 2 McCarthy, Rights of Publicity and Privacy § 11:50, at 785. Because the Estate's right-of-publicity claim relied on an element not equivalent to any of the exclusive rights granted to federal copyright holders, we hold that the first prong of § 301(a) is not satisfied here.

## 2. Copyrightable Subject Matter?

Looking to the second prong of 17 U.S.C. § 301(a), does Facenda's voice fall under the subject matter of copyright?  The Court of Appeals for the Ninth Circuit has stated, in the context of vocal imitations, that "[a] voice is not copyrightable. The sounds are not 'fixed.'  What is put forward as protectible [*sic*] here is more personal than any work of authorship." *Midler v. Ford Motor Co.*, 849 F.2d 460, 462 (9th Cir. 1988).  One can fix Facenda's voice in a tangible medium by recording it, but one cannot divorce his distinctive voice itself from the Facenda identity (or persona).  *See* 1 Nimmer on Copyright § 1.01[B][1][c], at 1-30 ("The 'work' that is the subject of the right of publicity is the persona, *i.e.*, the name and likeness of a celebrity or other individual.  A persona can hardly be said to constitute a 'writing' of an 'author' within the meaning of the Copyright Clause of the Constitution."); 2 McCarthy, Rights of Publicity and Privacy § 11:53, at 802 ("The sound in plaintiff's recording is merely an indicium by which the listening public can identify plaintiff's persona and identity.").  We hold that Facenda's voice is outside the subject matter of copyright.[12]  Thus, the second prong of § 301(a) is not satisfied.

\* \* \* \* \*

---

[12] This is so even though Facenda's voice is protectable as a trademark.  *See supra* Section V.

46

We conclude thus that copyright's express preemption provision, 17 U.S.C. § 301(a), does not bar the Estate's right-of-publicity claim.  Thus, we affirm the holding of the District Court to this effect.

## C.  Conflict Preemption

Our analysis, however, does not stop there.  We also consider whether federal copyright law impliedly preempts the Estate's right-of-publicity claim.

The analysis works as follows.  Copyright law does not expressly preempt the right of publicity because an individual's identity or persona is outside the subject matter of copyright.  *See, e.g.*, *Waits*, 978 F.2d at 1100; *Midler*, 849 F.2d at 462.  Yet in some situations, including this case, the right of publicity clashes with the exploitation of a defendant's copyright.  Unlike the plaintiffs in cases involving vocal imitations, *see, e.g.*, *Midler*, 849 F.2d at 460, Facenda collaborated with the NFL to create the copyrighted sound recordings at issue.  In our view, this gives the NFL a stronger preemption defense than the vocal-imitation defendants, for example.  Where a defendant in a right-of-publicity claim obtained a copyright in a work featuring the plaintiff, courts must separate legitimate exploitations of what Congress intended to be a copyright holder's exclusive rights from particular uses that infringe the right of publicity.  Otherwise, few copyright holders would be safe from suits by performers who agreed to appear in the holders' works.  *See* 2

McCarthy, Rights of Publicity and Privacy § 11:55, at 817 ("[W]hen another reproduces a recorded performance in an expressive, non-advertising medium, this should not be the concern of right of publicity law.").

Conflict preemption is a particular species of implied preemption that "renders state law 'without effect' when, without 'express congressional command,' state law conflicts with federal law." *Pa. Employees Benefit Trust Fund v. Zeneca Inc.*, 499 F.3d 239, 247 (3d Cir. 2007) (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)). As one copyright treatise puts it:

> Therefore, even apart from Section 301, the general proposition pertains in copyright law, as elsewhere, that a state law is invalid that "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." Such "conflict pre-emption" equally pertains when compliance with both federal and state mandates is a physical impossibility.

1 Nimmer on Copyright § 1.01[B][3][a], at 1-77. The Estate's claim, if successful, will constrain the NFL's ability to exercise its full array of exclusive rights under the Copyright Code. Yet

48

federal copyrights are not absolute.

Courts have found conflict preemption where state laws interfere with federal copyright law's goal of leaving some works, or uses of works, in the public domain.  *See id.* § 1.01[B][1][c], at 1-33 (citing *Brown v. Ames*, 201 F.3d 654, 660–61 (5th Cir. 2000)).  For example, these concerns might arise with respect to state laws offering protection for "sound-alike" sound recordings, which copyright does not protect.  *See id.* § 1.01[B][3][b][i], at 1-82 to -83 (discussing *Midler*, 849 F.2d at 460); *see also Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 269–70 (5th Cir. 1988) (holding that a Louisiana state law permitting a software producer to prohibit disassembly of its computer program conflicted with rights Congress left to software purchasers [under what is now 17 U.S.C. § 117(a) of the federal Copyright Code] and was therefore unenforceable).

Our case presents a different kind of potential conflict. Here we are concerned with the conflict between copyright law and the right of publicity.  When does the right of individuals to avoid commercial exploitation of their identities interfere with the rights of copyright owners to exploit their works?   In addition, we must confront the role of the standard release contract.  Does a contract acknowledging a right-of-publicity for defendant's copyright in a work containing a plaintiff's identity mean that the defendant may use that work in any way it sees fit?

49

David Nimmer has proposed a two-part framework for handling cases at the intersection of copyright, the right of publicity, and contract.[13] First, we look to how the copyrighted work featuring the plaintiff's identity is used. Surveying the case law, Nimmer finds that when defendants use the work "for the purposes of trade," such as in an advertisement, plaintiffs' right-of-publicity claims have not been held to be preempted. *See* 1 Nimmer on Copyright § 1.01[B][3][b][iv][I], at 1-88.2(9)–(11).[14]

---

[13] The cases that Nimmer uses to develop this framework are, for the most part, ones in which the court analyzed the preemption issue under the express-preemption test set out in 17 U.S.C. § 301(a). Nonetheless, Nimmer persuasively argues that "courts confronting the interface of rights of publicity with copyrighted works" deal with an issue "rooted more in conflict pre-emption and the Supremacy Clause of the U.S. Constitution than in express pre-emption and Section 301." 1 Nimmer on Copyright § 1.01[B][3][b][iv][I], at 1-882(15). Thus, we will treat the framework he develops as one that applies to analysis for either of these preemption contexts.

[14] The cases Nimmer places in this category of commercial or advertising uses are *Midler*, 849 F.2d at 460 (voice imitation in advertisement); *Waits v. Frito-Lay, Inc.*, 978 F.2d at 1093 (same); *White v. Samsung Electronics America, Inc.*, 971 F.2d at 1395 (robot with game show hostess's likeness used in advertisement); *Wendt*, 125 F.3d at 806 (robots with actors' likenesses used to market an airport restaurant); *Toney v. L'Oreal U.S.A., Inc.*, 406 F.3d 905 (7th Cir. 2005) (model's likeness on product packaging); *Downing,* 265 F.3d at 994

50

On the other hand, when defendants' uses constitute "expressive works," right-of-publicity claims have been preempted. *See id.* § 1.01[B][3][b][iv][I], at 1-88.2(11).[15] The rationale is that state law has a role in regulating practices of trade, including advertising. But limiting the way that material can be used in expressive works extends beyond the purview of state law and into the domain of copyright law.

---

(surfer's images, including T-shirts, in catalog); *Seifer v. PHE, Inc.*, 196 F. Supp. 2d 622 (S.D. Ohio 2002) (performer's likeness in promotional materials for video); *Comedy III Productions*, *Inc. v. Gary Saderup, Inc.*, 106 Cal. Rptr. 2d 126 (2001) (actors' images on T-shirts); *and—most importantly—the District Court's opinion in our case.*

[15] Nimmer puts into the category of expressive uses *Fleet v. CBS, Inc.*, 58 Cal. Rptr. 2d 645 (Cal. Ct. App. 1996) (distributing a movie in which the plaintiff acted); *Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134 (9th Cir. 2006) (licensing of a song by non-plaintiffs that included another portion of a song in which the plaintiff sang); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) (publishing a digitized image of an actor in a movie); *Astaire v. Best Film & Video Corp.*, 136 F.3d 1208 (9th Cir. 1997) (using public domain footage of an actor in a new video); *Polydoros v. Twentieth Century Fox Film Corp.*, 79 Cal. Rptr. 2d 207 (Cal. Ct. App. 1998) (using high school classmate's name in a film); and *Ahn v. Midway Mfg. Co.,* 965 F. Supp. 1134 (N.D. Ill. 1997) (using images of individuals in a video game).

51

*Seale v. Gramercy Pictures* was Nimmer's inspiration for this framework, and illustrates the distinction he draws. 949 F. Supp. 331 (E.D. Pa. 1996). Seale's right-of-publicity claim for use of his likeness to make a "docudrama" about the Black Panthers failed as a matter of law. *Id.* at 337–38. Nimmer contends that this claim should have been preempted because it targeted an expressive work. *See* 1 Nimmer on Copyright § 1.01[B][3][b][iv][I], at 1-88.2(12). On the other hand, Seale's claim based on the use of his image to sell compact discs (on which he did not perform) went to trial, *Seale*, 949 F. Supp. at 337 (although the defendants ultimately prevailed, *Seale*, 964 F. Supp. at 931). Nimmer suggests that this claim should not have been preempted even though it proved unsuccessful. *See* 1 Nimmer on Copyright § 1.01[B][3][b][iv][I], at 1-88.2(12) to -88.2(13).

The NFL used the sound recordings of Facenda's voice in a television production promoting the video game Madden NFL 06. This kind of use, in what amounts to a 22-minute promotional piece akin to advertising, does not count as an expressive work. Following the case law, this suggests that conflict preemption is inappropriate in our case.

The second part of Nimmer's framework addresses the way that contracts affect the preemption analysis. Nimmer proposes that courts should examine the purpose of the use to which the plaintiff initially consented when signing over the copyright in a contract. He argues that the proper question in cases involving advertising and a contract between the plaintiff and the

52

defendant—such as our case—is whether the plaintiff "collaborated in the creation of a copyrighted advertising product." 1 Nimmer on Copyright § 1.01[B][3][b][iv][II], at 1-88.2(20). If the plaintiff did collaborate in that fashion, then the party holding the copyright is in a very strong position to contend that allowing the plaintiff to assert a right of publicity against use of its likeness in advertising would interfere with the rights it acquired. If, on the other hand, the plaintiff did not collaborate specifically in the creation of advertising content, then the plaintiff is in a strong position to assert continuing control over the use of his image.

Three cases, along with the District Court's opinion in our case, provide the most important background case law for the second part of Nimmer's analysis. *Fleet v. CBS, Inc.* involved a right-of-publicity claim by actors seeking to prevent a movie-distribution company from distributing a film in which they appeared. 58 Cal. Rptr. 2d 645, 646–47 (Cal. Ct. App. 1996). The actors had contracted away their rights in the film, but had not received compensation. They apparently hoped to obtain leverage in seeking payment by enjoining distribution of the film. The California Court of Appeal held that the actors' claim was preempted, stating that "a party who does not hold the copyright in a performance captured on film cannot prevent the one who does from exploiting it by resort to state law." *Id.* at 652–53.

The Ninth Circuit Court of Appeals in *Laws v. Sony Music Entertainment, Inc.*, evaluated singer Debra Laws's claims that

53

Sony had violated her right of publicity by using a sample of one of her recordings in a song by Jennifer Lopez and LL Cool J. 448 F.3d at 1135–36. A third party, Elektra Asylum Records, owned the copyright in the original sound recording that featured Laws. Elektra granted Sony a license to use the sample in the J. Lo–LL Cool J song. Laws's recording contract with Elektra gave Elektra the right to grant licenses, subject to contractual conditions. In that context, whether Laws authorized the sample license was a contract issue between Laws and Elektra. But Laws sued Sony, the end user of the sample. *See id.* at 1143 ("To the extent that Laws has enforceable, contractual rights regarding the use of Elektra's copyright, her remedy may lie in a breach of contract claim against Elektra for licensing [her song] 'Very Special' without her authorization."). Even though Laws might have been able to state a contract claim against Elektra, her right-of-publicity claim against Sony was preempted by § 301(a).

In *Toney v. L'Oreal U.S.A., Inc.*, the plaintiff, a model, sued L'Oreal for the unauthorized use of her image on product packaging. 406 F.3d at 907. The plaintiff had a contract with L'Oreal's corporate predecessor to use her image in that way, but it had expired. The Court of Appeals for the Seventh Circuit held that the plaintiff's claim was not preempted. *Id.* at 911. "There is no 'work of authorship' at issue in Toney's right of publicity claim. A person's likeness—her persona—is not authored and it is not fixed. The fact that an image of the person might be fixed in a copyrightable photograph does not change this." *Id.* at 910. Thus, the second express-preemption requirement of § 301(a)

54

(that the state law at issue purports to protect something that falls within the subject matter of copyright) was not met, and accordingly Toney's claim was not preempted.

To illustrate this second part of his framework, Nimmer puts the fact situations in *Fleet*, *Laws*, and *Toney* on one side, and the fact situation of our case (which he uses as his main counter-example, based on the District Court's opinion) on the other:

> Fleet acted in a movie; for that reason, he could not complain when that very movie was later exploited, by being broadcast on television. Laws sang for a recording; for that reason, she could not complain when that very recording was later exploited, by being used as background for Jennifer Lopez. Toney posed for the packaging of "Ultra Sheen Supreme." Parallel reasoning indicates that she should not be able to complain about subsequent exploitation of that very work. The defendants in that case, in short, did not "appropriate[] the commercial value of a [Toney]'s identity by using [it] without consent." Far from it—they simply

55

> did exactly what she agreed to. In that regard, they stand poles apart from the NFL, when it took anchorman Facenda's sports commentary and transmuted it into part of a pitch for a computer game.

1 Nimmer on Copyright § 1.01[B][3][b][iv][II], at 1-88.2(18). Thus, with regard to Toney's claim, Nimmer answers the question "Did she collaborate in the production of a copyrighted advertising product?" in the affirmative. He argues that her case should have been an exception to the usual rule that right-of-publicity claims for uses in advertisements would not be preempted (and thus the Seventh Circuit erred). But in our case, Nimmer suggests that preemption is not appropriate. Facenda consented to participation in films documenting NFL games, not an advertisement for a football video game. The release form Facenda signed did not implicitly waive his right to publicity, the core of which is the right not to have one's identity used in advertisements. *See*, *e.g.*, 1 McCarthy, Rights of Publicity and Privacy § 1:3, at 3. In fact, the release specifically preserved that right by carving out endorsements.

The NFL argues that Facenda's only remedy should lie in contract. While we agree that Facenda could state a claim for breach of contract, we believe that he also retained his tort-derived remedy for violation of Pennsylvania's right-of-publicity statute. Parties may waive tort remedies via contract. It follows that they

may also preserve them. *Cf.* 1 Nimmer on Copyright § 1.01[B][3][b][iv][II], at 1-88.2(16) (discussing the relationship between "copyright, contract, and the right of publicity"). While performing artists should have the burden of reserving publicity rights when contracting away any rights under copyright law they might have, we hold that Facenda successfully bore that burden here and preserved his state-law right-to-publicity claim.

Despite our holding, we emphasize that courts must circumscribe the right of publicity so that musicians, actors, and other voice artists do not get a right that extends beyond commercial advertisements to other works of artistic expression. If courts failed to do so, then every record contract or movie contract would no longer suffice to authorize record companies and movie studios to distribute their works. In addition to copyrights, entertainment companies would need additional licenses for artists' rights of publicity in every case.

Thus, we believe that *Laws* was rightly decided—Debra Laws sought to enforce a right that she had contracted away. We do not intend to express any disagreement with the Ninth Circuit Court of Appeals by distinguishing the facts of our case from those of *Laws*. Our case simply presents a different scenario than *Laws*. Just as Facenda did not, in the standard release contract, waive the right to bring a false-endorsement claim, *see supra* Section V.B.1, he did not grant the NFL the right to use his voice in a promotional television program. This contrasts with the situation in *Laws*. Debra Laws's voice was not used in an endorsement, but in a work

57

of artistic expression.

In the endorsement context, an individual's identity and credibility are put directly on point.[16]  Advertisements are special in the way they implicate an individual's identity.  Precisely what Pennsylvania's right of publicity is meant to protect is a citizen's prerogative *not* to have his or her name, likeness, voice, or identity used in a commercial advertisement, whether that citizen is a celebrity or not.

In our case, we have no precedent to hold that the right of publicity in an individual's voice is analogous to the public domain.  In this void, we believe state-law protection of an individual's voice will not upset copyright law's balance as long as the state law is not construed too broadly.  Pennsylvania's § 8316 focuses solely on the commercial-advertising context.  It is targeted at endorsements, not the full universe of creative works.  The Estate's claim lies at the heart of the statute's focus.  For these reasons, the state-law right of publicity does not conflict with federal copyright law in this case.

---

[16] Having one's voice used as a sample in someone else's song may implicate a musician's identity.  But listeners are probably less likely to assume that the sampled musician vouches for or approves of a new creative work that samples her work than consumers are likely to assume that an individual's presence in an advertisement reflects an active choice to endorse a product.

\* \* \* \* \*

We hold that neither express nor implied conflict preemption bars the Estate's right-of-publicity claim under Pennsylvania law. We affirm the District Court's grant of summary judgment to the Estate on that claim.

## VII. Conclusion

This case presents dueling intellectual property rights of differing kinds. The NFL seeks to exploit its copyrighted films and scripts, yet the Estate has asserted both a trademark and a right of publicity in John Facenda's famous voice. In this sense, the Estate's guarding of its intellectual property rights has constrained the NFL's enjoyment of its intellectual property rights. In another clash of rights of a different variety, the NFL asserted a First Amendment defense against the Estate's false-endorsement claim. As a general matter, the District Court should have considered whether enforcement of the Estate's intellectual property rights under the Lanham Act overly constrained the NFL's right to free speech, though here we hold the NFL's First Amendment defense to trademark infringement fails.

We agree with the District Court that *Downing* usefully implements the well-known *Lapp* factors, so long as the fourth *Downing* factor is modified so that the substance of each of the ten *Lapp* factors is covered with an analogous factor.

59

Because § 43(a) of the Lanham Act protects the Estate's mark (Facenda's voice) only to the extent that consumers are likely to be confused by the NFL's use—a factual issue, we vacate the grant of summary judgment and remand to the District Court for trial on that claim.

As for Pennsylvania's right-of-publicity statute, it protects Facenda's voice in a way that does not conflict with federal copyright law. We thus hold that the Estate's right-of-publicity claim was not preempted.